In re Raymond J. McQUEEN, Jr., and Barbara A. McQueen, Debtors.

Douglas J. WOLINSKY, Esquire, Trustee, and Raymond J. McQueen, Jr., and Barbara A. McQueen, Intervenors, Plaintiffs,

v.

BRADFORD NATIONAL BANK, Defendant.

Bankruptcy No. 81–00253.
Adv. No. 82–0024.

United States Bankruptcy Court,
D. Vermont.

Feb. 7, 1983.

718

Douglas J. Wolinsky, Trustee, pro se.

Joseph C. Palmisano, Barre, Vt., for Debtors, intervenors as plaintiffs.

David C. Otterman, Bradford, Vt., for defendant, Bradford Nat. Bank.

Samuel C. FitzPatrick, Montpelier, Vt., for Agway, Inc., creditor.

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

This adversary proceeding for the recovery of an alleged preference was instituted by the Complaint of the Trustee, Douglas J. Wolinsky, Esquire, against the Bradford National Bank. The Debtors moved to intervene as party plaintiffs and an Order was entered permitting them to do so. Subsequently, they filed an Intervenors' Complaint to recover part of the proceeds of the alleged preference by virtue of their claimed exemptions under § 522(d)(5) which grants to each debtor an exemption not-to-exceed $400.00 plus any unused portion of the $7,500.00 residence exemption granted to the debtor under § 522(d)(1). The unused portion of the residence exemptions claimed by debtors, Raymond J. McQueen, Jr., and Barbara A. McQueen are $5,000.00 and $4,400.00, respectively. Both the defendant, Bradford National Bank, and creditor, Agway, Inc., objected to the allowance of these exemptions and, after hearing, they were denied by Order entered by this Court on December 15, 1982. There is a pending appeal by the Debtors from this Order.

The preference alleged by the Plaintiffs is based on the transfer of certain livestock from the Debtors to the Defendant Bank within 90 days prior to the filing of the Debtors' Petition for Relief, which livestock was sold at auction by the Bank and the proceeds applied toward the payment of an antecedent debt.

## FINDINGS OF FACT

The Debtors filed their Petition for Relief under Chapter 7 of the Bankruptcy Code on December 4, 1981 on which date Douglas J. Wolinsky, Esquire, was appointed interim trustee and he still is the duly qualified and acting trustee of the estate of the Debtors.

Prior to September 1, 1979 the Debtors owned a house in the Town of Orange, Vermont in which they had resided for a period of about ten years. While so residing in Orange they leased farm premises consisting of land and a barn in Williamstown, Vermont which they continued to lease until September, 1979. On September 1, 1979 they entered into a written lease as Lessees with George F. Lewis and Dorothy L. Lewis as Lessors for the use and occupation of certain farm premises situated in the Town of Groton, Vermont consisting of 35 acres of land, more or less, with house, barn, shed and other buildings thereon.

This lease was for a term of one year from September 1, 1979 to August 31, 1980 and it contained an option to extend the leasehold interest for an additional term of one year upon 90 days' notice. Upon the execution of this lease the Debtors moved into the Groton, Vermont premises and it was their intention to negotiate for the purchase of them.

On April 11, 1980 while they were residing on the Groton, Vermont premises, they borrowed money from the Bradford National Bank which was evidenced by a promissory note in the sum of $14,874.39 payable in 60 monthly installments of $402.40 beginning May 25, 1980. This note was secured by a security interest in all livestock (including offspring then owned and thereafter acquired plus any replacements or substitutions thereof) granted under a written security agreement dated April 11, 1980 and signed by the Debtors. This security agreement provided for the payment of the note of even date and of any other notes or any renewals or extensions thereof and any other past, present or future obligations of the Debtors to the Bank as secured party.

On May 6, 1980 and May 8, 1980 the Bank caused financing statements to be filed in the offices of the Groton Town Clerk and of the Secretary of State signed by Laurette Sweet as loan officer with Raymond McQueen and Barbara A. McQueen listed as debtors with the address shown as Groton, Vermont and the Bank as secured party and the collateral described as the same livestock as shown in the security agreement. The Debtors also signed these statements.

In April, 1981 the Debtors needed additional financing and on April 15, 1981 they executed and delivered to the Bank a mortgage note in the sum of $22,447.20 which was secured, under a security agreement signed by them, by a security interest in all livestock including offspring then owned and thereafter acquired by them with any substitutions or replacements and also by equipment and machinery then owned and thereafter acquired by them.

On April 29, 1981 the Bank caused financing statements describing the aforesaid collateral to be filed in the offices of the Williamstown Clerk and of the Secretary of State. These statements were signed by the Debtors and by Paul J. Gallerani for the Bank with the address of the Debtors given as Box 28, East Barre, Vermont 05641. At the time that they signed the note and security agreement dated April 15, 1981 and the financing statements the Debtors resided in their homeplace in Orange, Vermont and the cattle, equipment and machinery in which the Bank acquired a security interest were located in Williamstown, Vermont. As residents of Orange, Vermont their mailing address was P.O. Box 28, East Barre, Vermont. When they refinanced their loan with the Bank on April 15, 1981 there was an outstanding balance due the Bank on their April 11, 1980 loan, but the Bank marked the note and security agreement dated April 11, 1980 "Paid by Renewal" but it retained possession of these instruments.

For the years 1980 and 1981 Debtor Raymond McQueen was on the checklist for the Town of Orange, but his wife, Barbara A. McQueen, was not. During at least part of the time that the Debtors were residing in Groton, Vermont on the premises leased from George F. and Dorothy L. Lewis (September 1, 1979 to August 31, 1980) their house in Orange, Vermont was occupied by Mr. Duso (a brother of Mrs. McQueen) and his family.

The Debtors defaulted on their loan and November 27, 1981 they owed the Bank a balance of $22,596.78. On that date the Debtors had 45 head of Holsteins which were subject to the security interest of the Bank and, with the consent of the Debtors, they were sold by the Bank at auction conducted by C.W. Gray & Sons, Inc. The net sum of $20,953.00 was realized from this sale and the Bank applied the proceeds toward the then outstanding balance of $22,-596.78.

## DISCUSSION

■ The issue to be determined is whether the transfer of the cattle and their sale

by the Bank was in fact a preference which can be avoided by the Trustee, it having occurred within 90 days before the filing of the Petition at a time when the Debtors were insolvent. If in fact the Bank held a perfected security interest in the cattle sold on the date of the auction the Trustee's position could not be maintained and there would be no preference. The Court holds that the Bank did have a perfected security interest in the cattle sold. As a result no preference was created.

Under the Uniform Commercial Code livestock is included in "farm products." The pertinent section of the U.C.C., as adopted in this state as it applies to "farm products" and designates the proper place for filing of a financing statement to perfect a security interest is 9A V.S.A. § 9–401(1)(a), and this section provides that the filing shall be made in the office of the town clerk in the town of the debtor's <u>residence.</u> (Underscoring supplied.)

The meaning of residence is not spelled out in the U.C.C. As a result the courts have been required to construe the legislative intent as it applies to "residence" and the decisions are far from unanimous.

■ It has been held that "permanent residence" is contemplated under the statute. *In Re Pelletier* (D.Me.1968) 5 U.C.C. Rep. 327. In a more recent case, the Second Circuit construed the word residence as the debtor's "actual residence;" i.e., "living in a particular locality and required bodily presence as an inhabitant in a given place." *In re Knapp,* 575 F.2d 341, 343 (2d Cir.1978). It is obvious that there is a clear distinction between "permanent residence" or domicile and "residence." The latter may mean "a temporary, permanent or transient character," or it may mean one's fixed abode, depending upon the purpose of the particular object of its use. In determining its meaning as it is used in particular pieces of legislation, its context within the statute and the legislative purpose are examined. By comparison, domicile is said to be inclusive of residence, having a broader and more comprehensive meaning than residence. 25 Am.Jur.2d 7 § 4.

■ Domicile is defined as a place where a person lives or has his home, to which, when absent, he intends to return, and from which he has no present purpose to depart. *Tower v. Tower,* 120 Vt. 213, 221, 138 A.2d 602; *Walker v. Walker,* 124 Vt. 172, 174, 200 A.2d 267.

■ The Trustee and Agway, Inc., both contend that by filing the financing statement in the office of the Town Clerk of Groton where the Debtors resided on May 6, 1980 the Bank failed to meet the requirements of 9A V.S.A. § 9–401(1). Relying on *Bonneau v. Russell,* 117 Vt. 134, 85 A.2d 569 (1951) they assert that the financing statement should be filed at the domicile of the Debtors rather than their place of residence. The Court does not agree. Bonneau is a pre-code case which involves the recording of a mortgage and, for that reason, is not apposite.

The meaning of "residence" in the pertinent statute must be construed in the light of the Uniform Commercial Code and its legislative purpose. The purposes and rules of construction are recited in 9A V.S.A. § 1–102 in part as follows:

"(1) This title shall be liberally construed and applied to promote its underlying purposes and policies.

"(2) Underlying purposes and policies of this title are

(a) to simplify, clarify and modernize the law governing commercial transactions;

. . . (c) to make uniform the law among the various jurisdictions."

The Vermont Bar Association Special Committee on Uniform Commercial Code in indicating why the U.C.C. should be enacted in this state pointed out the following:

"The new and different security device is the essence of simplicity. It reflects the fact that the fundamental elements in security in personal property are the objective of conferring upon a particular creditor or secured party a priority position in certain property against the risk of the insolvency or bankruptcy of the

debtor, and secondly, a means of notifying competing creditors of the fact of the existence of such secured interest. These fundamental elements are the essence of the security system framed by the Uniform Commercial Code. Simplicity is the watchword."

Likewise the Court *In Re Knapp,* 575 F.2d 341 (CA 2nd 1978) said:

"One of the primary purposes motivating the drafters of UCC § 9–401 was to simplify the creditor's task in choosing the proper place to file. Accordingly, they denominated the place of filing for consumer goods as the county of the debtor's actual residence."

And in 23 Oklahoma Law Review 205, construing the meaning of "residence" under the U.C.C., made the following observation:

"The better view is that 'residence' should be construed in its most liberal sense. That is, it requires a well-settled physical connection with the community in question including the maintenance of a fixed place of abode. This is so because of the transient nature of a large segment of our society. Under the law of domicile in most states, one never loses his domicile until a new one is acquired. To acquire a new domicile there must be a physical presence plus the intent to remain there permanently. A person, such as a member of the armed forces, employed in a position in which he can expect to be transferred from one locale to another regularly does not acquire a new domicile each time he moves because there is no intention to remain there permanently. But such a person does acquire a 'residence,' as defined above, in each new location. This type person may never spend more than a few days or weeks at a time at his permanent residence or domicile throughout his entire career. This type of situation occurs sufficiently often, particularly in Oklahoma, that it would actually be defeating the intent and purpose of the filing provisions to hold that the financing statement must be filed in the county of the debtor's domicile. It is much more likely that a creditor would normally look for information concerning interests created by the debtor in the county in which the debtor presently resides."

Intent is an essential element of domicile.

In view of the purpose and the rules of construction applicable to the U.C.C. it would appear that a creditor should not be required to search the mind of the debtor so that he can make a determination of his domicile before filing a financing statement for the protection of his security interest. Further, after the fact, a debtor, either consciously or subconsciously aware of his self-interest, might very easily misstate his intention as to residence existing at the time that the security interest was created and the financing statement filed. The probability of such a situation was pointed out by the Court in *Walker v. Walker,* 124 Vt. 172, 174, 200 A.2d 267, as follows:

"The troublesome aspect of domicile is that it deals not only with acts, but with states of mind. This is difficult enough, but courts must also recognize that legal consequences may tempt parties to seek advantage by misstating intentions and engaging in calculated actions to give apparent support to those misstated intentions. The fact-finding aspects of domicile may then become subtle, indeed. But where the structure of domicile change is fabricated and a discrepancy appears, the situation may be likened to the discrediting effect of a disproved alibi, yielding unfavorable inferences as to motives and intentions."

See also *In Re Knapp,* supra, in which Chief Judge Kaufman said:

"Significantly, the Code eschews any scheme that would require a secured party to maintain regular and continuing surveillance of the debtor. A security interest, once perfected by filing, remains effective regardless of the number of times or places the debtor or the collateral moves. UCC § 9–401(3). To suggest that the express intention of the debtor respecting residence controls would needlessly complicate the Code's design."

*In Re Knapp* expresses the view which is consonant with the U.C.C. It represents the view of this Circuit and for that reason should be followed.

The Trustee argues that Knapp is predicated on the definition of "residence" under New York law as living in a particular locality and requiring bodily presence as an inhabitant in a given place. This is a generally accepted definition and should be equally applicable in this state. The Court is satisfied that the evidence in the instant case establishes that at the time of security interest attaching and the filing the Debtors resided in Groton with the then intention of remaining. This was sufficient to satisfy the requirements of the statute as to "residence."

*In Re Pelletier,* supra, held that a permanent residence was required to satisfy the filing required. It was decided by Bankruptcy Judge Cyr, acknowledged to be very scholarly and now a U.S. District Court Judge. However, it was a case decided shortly after the U.C.C. was enacted and apparently the Court felt safe in following the pre-code cases defining "residence." The Pelletier case has been criticized. See Willier and Hart, Reporter-Digest, Case Annotations, Bender's UCC Services § 9–401A 20 (1969 Ed.):

"It is submitted that perhaps Referee Cyr has mistaken the intended meaning of "residence in Section 9–401. . . . The Code probably intends residence to mean the place where the debtor has an abode when the financing statement was filed."

In sum, *Bonneau v. Russell,* supra, relied upon by the Trustee and Agway, Inc., is pre-code and archaic; *In Re Pelletier* is not in harmony with the purpose and intent of the U.C.C.; *In Re Knapp* correctly interprets the applicable "residence" provision as to filing and, as a Second Circuit case, it should be followed.

■ Agway, Inc., also argues that the Bank, in refinancing the loan of April 11, 1980, did on April 15, 1981 accept a new note from the Debtors and that this constituted payment of the old note. It relies on *Dixon v. Dixon, et al.,* 31 Vt. 450. At the same time it concedes that there is authority for the proposition that payment of the old note by a new note is not cancellation of the security held by the payee of the original note. *Pinney v. Kimpton,* 46 Vt. 80; *Robinson v. Leach, et al.,* 67 Vt. 128, 31 A. 32. However, it contends that these cases are distinguishable since in the instant case the Bradford Bank marked the note and security agreement "Paid by Renewal."

Agway's claim is ill founded. There was no evidence that the Bank received the second note in payment of the first one executed on April 11, 1980. It is true that the Bank marked this note and the security agreement of the same date "Paid by Renewal," but it retained possession of these instruments. This evinced an intention to hold them as outstanding until payment of the new note was made. Had there been an intention to consider them paid they would have been so marked without the words "by renewal" and delivered to the Debtors.

The instant case comes within the purview of *Pinney v. Kimpton* and *Robinson v. Leach, Assignee,* supra. In the *Robinson* case 67 Vt. at page 192, 31 A. 32, the Court said:

"Courts will if they can, when justice requires it, look behind the evidence of the debt and consider the debt itself, and decide according to that. This is always done when mortgage notes are <u>renewed</u>. As long as the original debt can be traced the security remains, no matter how many <u>renewals</u> there have been. (Underscoring supplied.)

The security agreement of April 11, 1980 provided for the payment of any other notes or any *renewals* . . . present or future obligations of the Debtors to the Bank as secured party. This language by itself would stifle Agway's argument.

■ It has been generally held that a perfected general security agreement which specifically provides for future advances is, by its terms, a "continuing agreement" until revoked by the debtor upon notice to the creditor. In the absence of such revocation,

neither extinguishment of the original loan, renewal of the original obligation, nor the fact that no financing statement was filed in connection with the future advances, results in an impediment to the creditor's continuing security interest. See *In re Peska Associates, Inc.,* 27 U.C.C.Rep. 273, 277 (S.D.N.Y.1979); *In re Gilchrist,* 403 F.Supp. 197, 18 U.C.C.Rep. 242 (E.D.Pa.1975), aff'd without opinion, 535 F.2d 1246 (3rd Cir. 1976); *In re Rivet,* 299 F.Supp. 374, 377, 6 U.C.C.Rep. 460 (E.D.Mich.1969); *Thorp Finance Corp. v. Hodgins,* 73 Mich.App. 428, 251 N.W.2d 614, 21 U.C.C.Rep. 881 (1977).

In conclusion this Court holds that the Bradford National Bank held a perfected security interest in the cattle sold at auction and is entitled to the proceeds received from the auction.

## ORDER

Upon the foregoing,

IT IS ORDERED that the Complaint of the Trustee and of the Debtors as Intervenors is hereby DISMISSED WITH PREJUDICE.