**In re Thomas W. ASBRIDGE and Laura Asbridge, d/b/a Horseshoe Cattle Co., Debtors.**

**FIRST BANK OF SOUTH DAKOTA (National Association), a/k/a First National Bank in Lemmon, Plaintiff,**

v.

**Thomas W. ASBRIDGE, a/k/a Tom Asbridge, and Laura Asbridge, Defendants.**

Bankruptcy No. 84–05172.
Adv. No. 84–7070.

United States Bankruptcy Court,
D. North Dakota.

Dec. 13, 1984.

Joseph A. Turman, Fargo, N.D., for plaintiff.

David L. Evans, Bismarck, N.D., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The instant action was commenced by a Complaint filed on May 17, 1984, by First Bank of South Dakota (BANK) seeking a determination of the nature and extent of its security interest in and to property of the Debtors. The controversy is principally concerned with the effect of a security agreement entered into on November 8, 1982. The Debtors deny that this security agreement extends to the interest of the Debtor, Laura Asbridge, in the collateral beyond the amount of indebtedness for which both she and the Debtor, Thomas Asbridge, are jointly liable. The parties entered into a joint stipulation of uncontested facts, and trial of the matter was held on October 25, 1984.

### FINDINGS OF FACT

From the joint stipulation and the evidence presented at trial, the Court finds the material facts as follows:

1.

Thomas Asbridge and Laura Asbridge are married persons residing in Carson, North Dakota. Thomas operates a ranching operation under the name of Horseshoe Cattle Co. It is Thomas who conducts the entire cattle operation, including buying and selling of cattle, purchase of machinery

and equipment, and negotiation of necessary loans including loans with the Bank involved in this proceeding. There is no evidence that Laura participated in the purchase of equipment or that she has an ownership interest in the cattle. At trial, Laura testified that there are no documents evidencing her interest in the machinery but that her only claim of an ownership interest is by virtue of being Thomas' wife. As for the cattle, she denied any interest in the presently existing cattle, stating that Thomas owns them all. The company does use a brand registered to both Thomas and Laura, and the cattle were apparently branded by means of this joint brand. Beyond the use of a joint brand registration, the Debtors did not introduce any partnership agreement, title documents, purchase documents or sale receipts which would further evidence Laura's interest in machinery or cattle. Her only basis for such a claim of interest is apparently by virtue of her marital status.

2.

The parties have a history of large borrowing in order to finance the cattle operation. In 1981, they obtained a $300,000.00 line of credit from the Bank with the draws against this credit line being paid off in October of 1982. At that time, a new line of credit was arranged for in the sum of $350,000.00. On November 8, 1982, both Thomas and Laura signed a blanket security agreement covering all farm machinery and equipment including all substitutions and replacements now or hereafter acquired. The security interest also extended to all livestock and the young now or hereafter acquired; all feed, seed and farm supplies. On page 2 of the agreement, its purpose is set forth as:

> To secure payment to the Bank at its banking house at the address stated above all notes of Borrower concurrently herewith, heretofore or hereafter delivered to or purchased or otherwise acquired by the Bank, and all other liabilities and indebtedness of Borrower to Bank, due or to become due, direct or indirect, absolute or contingent, joint or several, howsoever created, arising or ev-

idenced, now existing or hereafter at any time created, arising or incurred (hereinafter called "Secured Obligations").

From January 10, 1983, to March 13, 1983, the Bank extended to the Debtors a series of operating loan advances relying upon the November 8, 1982, security agreement.

On April 13, 1983, the Bank extended the Debtors an operating line of credit in the sum of $2,350,000.00 evidenced by a promissory note in that amount signed by both Thomas and Laura. As security for this line of credit, the Bank relied upon the November 8, 1982, security agreement and in addition took a real estate mortgage signed by both Thomas and Laura. The note evidencing the operating line of credit makes reference to a security agreement covering all livestock, feed and machinery.

The Bank made advances against the April line of credit until October 12, 1983, when the Bank's arrangement with the Debtors came up for reconsideration and renegotiation. A balance of $462,498.02 remains unpaid on the advances made on the April 13, 1983, line of credit. During late fall of 1983, the Bank was concerned whether to continue loaning the Debtors additional funds and in contemplation of a new loan agreement, the Bank on December 9, 1983, prepared a document captioned "Loan Application, Renewal and Review" (Exhibit 14). On this document, the Bank expressed its concern regarding the Debtors' viability, noting that the Bank was encouraging them to attempt financing through FHA. This document also indicates the Bank's approval of "Option B" with a total line of credit of $571,000.00 secured by collateral, real estate mortgage, vehicles, machinery and mobile homes. "Option B" was reduced to writing by the Bank in the form of a document denoted "Loan Agreement" (Exhibit 16). The "Loan Agreement" committed the Bank to providing the Debtors an operating line for 1984 if alternative financing was not forthcoming.

Paragraph 4 thereof provides that security for the advance would include all live-

stock, feed, machinery, equipment, vehicles, mobile homes, assignment of life insurance and collateral plus the real estate mortgage. This "Loan Agreement", while signed by the Bank on February 9, 1984, was never signed by either Thomas or Laura although both of them were aware of it and Thomas understood it would constitute a new loan agreement.

At the time of the negotiations for this new loan commitment, there remained unpaid the $462,498.02 balance from the April 1983 commitment advances, and the security agreement entered into on November 8, 1982, remained in effect. There was no evidence presented to the Court demonstrating that the Asbridges revoked the security agreement, that they entered into any agreement to do so, or that the Bank took any steps on its part towards revocation. The testimony of Tim Brown, Vice-President of the Bank, was that the Bank relied on the November 8, 1982, security agreement as partial collateral for the new 1984 loan commitment. This fact is evidenced from paragraph 4 of the "Loan Agreement".

The Bank, apparently anticipating that the Debtors would be signing the "Loan Agreement", began to extend them a series of five short-term loans, each evidenced by a note. Each note was signed only by Thomas. These notes were made on December 19, 1983; January 20, 1984; February 23, 1984; March 6, 1984; and March 19, 1984, and totalled $647,400.00 with the proceeds used for ranch operations. No portion of the indebtedness represented by these five notes has been paid and, when added to the balance remaining from the previous April 1983 loan commitment, brings the total outstanding obligation owing to the Bank to $1,109,898.02.

Each of the foregoing five notes bears on its face an indication that it is secured by a security agreement covering livestock, feed and machinery. The only security agreement in existence was the blanket security agreement of November 8, 1982, and the Bank's officer testified it was in reliance upon that security agreement that the five

loans were made. The Court concludes that any reference in the "Loan Application, Renewal and Review" document, in the "Loan Application" document and in each of the five notes was to the November 8, 1982, security agreement, an agreement which was in effect and remained in effect at all times.

## CONCLUSIONS OF LAW

The Debtors acknowledged that the November 8, 1982, security agreement attaches to secure payment of the $462,-498.02 balance remaining on the April 13, 1983, line of credit because both Debtors signed the note. They urge, however, that the November 8, 1982, interest does not attach to the individual indebtedness of Thomas totalling $647,400.00 as evidenced by the five short-term notes. They further urge that the November 8, 1982, security agreement cannot extend to Laura's interest in any collateral pledged as security for the five short-term notes because she did not sign them.

1.

■ It is undisputed that Laura has an interest in the real estate in which the Bank took a mortgage and consequently it is not seriously disputed that the Bank's interest in the real estate is perfected. Laura's claim of interest in the personal property, however, is made only by virtue of her marital status. The ranching operation known as Horseshoe Cattle Co. was operated exclusively by Thomas, and he acknowledged that the proceeds from each of the five short-term notes were used for operating expenses, the purchase of cattle, feed, fuel and land rent. There was no evidence presented at trial which caused the Court to believe that Thomas and Laura owned the personal property as joint owners. As noted in *In re Davison*, 738 F.2d 931 (8th Cir.1984), the burden rests with the debtors to prove a spouse's actual ownership in personal property. This burden was not carried by the Debtors, and the Court is satisfied that the ranch operation was the sole province of Thomas and

that he was the sole owner of the livestock, machinery and feed.

## 2.

■ The Debtors argue that it was not their intent that the November 8, 1982, security agreement should extend to later advances and that they never contemplated that subsequent transactions would be brought under it. The facts belie their position. The Debtor, Thomas, has a history of large and involved financial transactions involving the purchase of cattle. The Court cannot take seriously the argument that a person sophisticated enough to make a series of five notes totalling over one-half million dollars in the span of four months does not know and appreciate the nature and extent of attendant security agreements. Each of the five notes refer to a "Security Agreement" covering livestock, feed and machinery. What other security agreement did Thomas think these notes were referring to? He knew at the time of making these notes that the only security agreement in existence was the November 8, 1982, agreement, and he also knew that it had not been revoked by him or the Bank and that a balance remained on the original indebtedness.

The November 8, 1982, security agreement is clear on its face that it was being given to secure payment of all notes present or future, joint or several, regardless of how or when created. The agreement was signed by both of the Debtors. The security agreement by its terms clearly covers future advances made to either or both of the Debtors, joint or singular. N.D.C.C. § 41–09–17(3) (U.C.C. § 9–204(3)) expressly provides for the inclusion of future advances in security agreements, whether or not the advances are given pursuant to commitment. The practice in agricultural financing of taking a blanket security interest to cover future advances is quite common and was, the Court believes, within the contemplation of the parties both when the security agreement was entered into and when the five short-term notes were later made. It is beyond imagi-

nation to believe that the Bank would loan the amounts that it did without relying upon a security agreement. And the evidence does indicate that the Bank relied upon the November 8, 1982, security agreement. The case of *In re McQueen*, 27 B.R. 717 (Bankr.D.Vt.1983) sets out the established law regarding future advances:

> It has been generally held that a perfected general security agreement which specifically provides for future advances is, by its terms, a *"continuing agreement" until revoked* by the debtor upon notice to the creditor. In the absence of such revocation, neither extinguishment of the original loan, renewal of the original obligation, nor the fact that no financing statement was filed in connection with the future advances, results in an impediment to the creditor's continuing security interest. (citations omitted) (emphasis added).

It is noted that *In re McQueen* was affirmed on appeal. *See Wolinsky v. Bradford Nat. Bank*, 34 B.R. 702 (D.C.Vt.1983).

The November 8, 1982, security agreement quite clearly was a continuing agreement for future advances. It is furthermore clear that it was not revoked by either of the Debtors and that by its terms it did cover individual obligations later incurred by either of them. Accordingly, it is the opinion of the Court that the Debtors' indebtedness of $1,109,898.02 to First Bank of South Dakota, a/k/a First National Bank in Lemmon, is secured by a perfected security interest in all livestock, farm machinery and equipment as well as real estate as evidenced by the November 8, 1982, security agreement and the real estate mortgage given on April 13, 1983.

IT IS SO ORDERED.

JUDGMENT MAY BE ENTERED ACCORDINGLY.