**In re Brenda S. DEEB, d/b/a Annastasya Arabians, Debtor.**

**Bankruptcy No. 83–04327.**

United States Bankruptcy Court, N.D. Alabama.

April 2, 1986.

Thomas J. Knight, Anniston, Ala., for debtor.

Howard Warren, Gadsden, Ala., for creditor.

### FINDINGS OF FACT, CONCLUSIONS BY THE COURT, AND ORDER ON MOTION FOR REHEARING

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

The above-styled bankruptcy case is pending before this Court under title 11, chapter 11, United States Code, and no trustee has been appointed. On November 25, 1985, the bankruptcy judge entered findings, conclusions, and an order granting to Central Bank of the South (hereinafter "bank") relief from the stay provided by 11 U.S.C. § 362(a), by way of leave to enforce its security interest in one of the debtor's Arabian mares, named "Anna Kosandra."

The order of the Court was the culmination of a contested matter which was instituted by a motion of the bank for such relief. After the filing of the motion and by consent of the movant, the Court had entered an order that the stay would continue in effect pending the further order of the Court, "without regard to the provisions of 11 U.S.C. § 362(e)." In this contested matter, the debtor opposed the granting of the motion and sought to defeat the bank's request upon the general proposition that the bank did not hold a perfected security interest in the horse.

The debtor's position, of course, rests upon the provisions of 11 U.S.C. §§ 544(a)(1) [see § 101(30), (31)] and 1107(a), together with *Uniform Commercial Code* § 9–301(3).[1] That position[2] would not enable the debtor to defeat the bank's request for relief from the stay, unless the bank fails reasonably to satisfy

the Court that its security interest in the debtor's horse is perfected. In support of this aspect of its motion, the bank introduced into evidence a copy of an appropriate financing statement which had been filed for record with the probate judge at Huntsville, Alabama, county seat of Madison County, on July 21, 1980. This was to show compliance with the requirement that a financing statement be filed in order to secure perfection of the security interest, as set out in *U.C.C.* § 9–302(1).[3] Under *U.C.C.* § 9–109(3)[4] the debtor's horse is classified as "farm products," and under the Alabama version of *U.C.C.* § 9–401(1)[5] the filing of the financing statement must be made "in the office of the judge of probate in the county of the debtor's residence." The debtor maintains that the filing of the financing statement was ineffectual to perfect the bank's security interest in the horse for that Madison County, where the financing statement was filed, was not "the county of the debtor's residence." Initially, some contention was made that, at a point during the period of time involved here, the debtor's indebtedness to the bank had been paid off or had reached a zero balance and that the financing statement was ineffectual to perfect a security interest in collateral for a subsequent indebtedness owed by the debtor to the bank. Counsel for the debtor now advises the Court that the latter contention is no longer insisted upon.

On November 27, 1985, the debtor filed in this case a motion requesting that the Court reconsider its order of November 25, 1985, and amend or vacate said order. The basis for this motion was the debtor's contention that the phrase "the county of the debtor's residence" in *U.C.C.* § 9–401(1) re-

---

1. Code of Ala. § 7–9–301(3) (1975, rep. vol. 1984).

2. The gist of the position is that the debtor, as a "debtor in possession" in the chapter 11 reorganization case, has the rights and powers (subject to certain limitations) of a trustee in such a reorganization case and that an unperfected security interest in property of the estate is unenforceable against such a trustee; hence, the bank would not be entitled to relief from the stay provided by § 362(a), for the purpose of

enforcing an unperfected security interest in property of the estate—here, one of the debtor's horses.

3. Code of Ala. § 7–9–302(1) (1975, rep. vol. 1984).

4. *Id.* § 7–9–109(3).

5. *Id.* § 7–9–401(1).

ferred to, in this instance, Clay County, Alabama—not Madison County, that the Court had misfound the facts, and that the basis for the order was inconsistent with the Court's findings on other contested matters in this case. The Court must now determine whether it should reconsider the question of whether the financing statement was filed "in the county of the debtor's residence"; and, if so, whether the previous findings and order should be overturned.

The bankruptcy judge, upon a due consideration of the motion and the previous findings and order, is of the opinion that a somewhat unique question is presented here, that it was not fully explored by the Court in its previous determinations, and that the entire matter should be reconsidered. As will appear, this requires a re-examination of the facts involved, as well as the applicable law. As will further appear, the debtor, at the times involved, had, in fact, a place of residence in Madison County and a place of residence in Clay County.

*Findings of Fact—*

During the course of the proceedings on the bank's motion leading to the order of November 25, 1985, counsel for the bank took the deposition of the debtor in regard to the matter before the Court, and this testimony, with the documentary evidence of the bank and matters stipulated by counsel, constitutes the evidence from which the facts must be found. Because a determination of "the county of the debtor's residence" is the only factual issue which springs from the limited dispute now before the Court, findings by the Court of primary facts initially pertinent in general to this contested matter may be and will be pretermitted. From the evidence, the bankruptcy judge finds the facts on the limited issue before the Court, as follows:

1. The debtor's father was a native of Clay County, but, before retirement from work, was last employed by "N.A.S.A." and maintained a residence or home in Huntsville, Madison County, Alabama;

2. The debtor lived with her parents at Huntsville, when she graduated from high school in the year 1961, and she continued to live in Huntsville through approximately 1972;

3. From 1964 to sometime in 1968, the debtor was employed by Chrysler Corporation, at Huntsville, and at all times afterwards the debtor has been self-employed, "raising Arabian horses";

4. The debtor's horses were kept by her in Madison County until the year 1972, when she began moving her horses to Clay County, where one of her grandmothers had a home and land on which the horses moved to Clay County were kept over a period of several years;

5. In 1972, or shortly thereafter, the debtor had moved a part of her horses to Clay County and was residing at her grandmother's home there a majority of the time;

6. The debtor, however, continued to spend a substantial amount of time at Huntsville, where her parents continued to maintain a home until 1978 (two or three years after her father's retirement) when he moved back to Clay County;

7. Until the debtor's father moved from Huntsville back to Clay County in the year 1978, the debtor utilized her parents' home in Huntsville as a place to "live" or to "stay" for the times spent in Huntsville by the debtor;

8. In the year 1978, the debtor purchased a farm of some 25 acres, with a dwelling house on it, in Clay County and rented an apartment in Huntsville;

9. The farm was purchased to provide a place to keep a portion of the debtor's horses, with some part of the horses still kept at her grandmother's place, and the debtor occupied the dwelling house on the farm during the times which she spent there;

10. In 1978, the debtor had completed a portion of her intended college education and was attempting to continue with it in Huntsville, and Huntsville was used by her as a convenient place from which she attended horse shows in the states of Tennessee, Mississippi, and Arkansas, and the

apartment was rented in order to provide a place for her to stay during the times spent by the debtor in Huntsville, after her father gave up his home there;

11. Shortly before or at the time that the debtor commenced this case, by filing her petition on August 12, 1983, the debtor gave up her Huntsville apartment because of the pinch of her financial circumstances;

12. By the year 1979, the debtor had ceased boarding any of her horses in Madison County and had moved all of them to Clay County, where they were kept at her grandmother's place or on her own farm up until the time of the commencement of this case;

13. A financing statement covering "Anna Kosandra" or this horse and another horse was filed with the probate judge at Huntsville, in Madison County, by the bank, on December 15, 1978, May 26, 1979, October 5, 1979, and July 21, 1980;

14. On August 2, 1982, the debtor renewed a debt owed to the bank in the sum of $17,257.07, and executed a security agreement which made "Anna Kosandra" and a certificate of deposit for ten to eleven thousand dollars collateral or security for the payment of the debt, which had its origin in a loan by the bank to the debtor of the sum of $17,257.07 in July of 1981;

15. At the commencement of this case, the bank had liquidated the certificate of deposit and applied the proceeds to the debt and claimed an indebtedness due from the debtor in the sum of $7,806.73—allegedly secured by "Anna Kosandra," valued by the debtor at $15,000;

16. In a promissory note given by the debtor to the bank, as a part of the debt-renewal transaction on August 2, 1982, the debtor's address was stated as "1505 Sparkman Dr Apt. 290 Huntsville, Al. 35805," which referred to the location of the debtor's apartment;

17. The security agreement stated that the horse would be kept "at the following address: Route 2 Box 202–N Lineville, Al.

36266"—this being in Clay County—and provided that the debtor would "keep the property fully insured," which the debtor had not done, as of the time of the granting of the bank's motion; and

18. For all periods of time relevant here, the debtor had two places of residence, one being her apartment in Huntsville, Madison County, and the other being her farm in Clay County, near Lineville, with the latter being the principal residence and the more permanent residence.

*Conclusions by the Court—*

Section 9–403(2) of the *U.C.C.*,[6] basically, provides that "a filed financing statement is effective for a period of five years from the date of filing." There was no contention that the debtor had demanded a "termination statement" of the bank, which could be done if there "were no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value," as provided for by *U.C.C.* § 9–404(1).[7] Thus, any of the four filed financing statements would be sufficient to establish that the bank's security interest was a perfected one on August 12, 1983, when the debtor's petition was filed. There was no detectable change in the debtor's places of residence at the time of filing of any of the financing statements or at the time of execution of the last security agreement, on August 2, 1982. At all of these times the debtor had a place of residence in Madison County and one in Clay County.

The legal question here is rare and not well settled by the reported court opinions. The question here is whether the *U.C.C.* requirement that a financing statement on this horse be filed "in the county of the debtor's residence" permitted it to be filed in either Madison or Clay County or directed that it be filed in one of those as opposed to the other or required that it be filed in both.

The Monday morning quarterbacks of jurisprudence sometimes have a cross-eyed

---

6. *Id.* § 7–9–403(2).

7. *Id.* 7–9–404(1).

view of problems arising in litigation under the *Uniform Commercial Code.* The tendency seems to be to place on judicial interpretation blame for any failure of the Code to achieve its utopian goals—particularly those of simplification and the avoidance of uncertainty in secured commercial-credit transactions. One, however, may wish to note the words of Chief Circuit Judge Kaufman in *In re Knapp:* [8]

> Article Nine of the Uniform Commercial Code (UCC), responding to the myriad of existing security devices, established a comprehensive statutory scheme for the creation and regulation of security interests. Yet, despite this simplification and clarification of the law, the answers to relatively straightforward questions remain clouded by uncertainty. ... [9]

These comments were echoed in *International Harvester Credit Corp. v. Vos:* [10] "[a]lthough it is the purpose of the UCC to simplify and clarify the law regarding the creation and regulation of security interests, certain relatively straightforward questions of commercial law remain unanswered."

In the case of *In re Armstrong,* [11] the bankruptcy judge dealt with a situation somewhat similar to the one here. There, a debtor owned a home in which he lived with his wife and children in County "A," while working in County "B." The debtor's family remained in the home in "A" after the debtor moved to "B." When the debtor purchased an automobile on credit, the creditor, based on previous dealings, assumed that the debtor's residence was still in "A" and filed a financing statement on the automobile in "A." The bankruptcy judge held this to be a filing "in the county of the debtor's residence" and that the security was perfected initially." [12]

This result was based upon a conclusion that the filing direction referred to the county of the debtor's "permanent" residence. *In re Pelletier,* [13] was cited as authority for that conclusion. In *Pelletier,* the state statute required that a financing statement be filed "in ... the municipality in which the debtor resides." There, the bankruptcy judge applied judicial interpretation of prior chattel mortgage filing requirements in concluding that the term "resides" referred to the place of the debtor's "permanent residence." The bankruptcy judge stated that the judicial precedents also had held that "permanent residence" was determined from the debtor's physical presence in a place and " 'the accompanying intent of choosing that place as a permanent residence.' " [14] Although it was found that the debtor in *Pelletier* had abandoned his previous place of "permanent residence," where a creditor had filed its financing statement, the debtor apparently had not acquired a replacing "permanent residence." The debtor had departed "A" (where the financing statement was filed), although the debtor left his household goods there in a rented apartment which the debtor retained until after the financing transaction. The debtor was living in "B" but intended to live permanently in "C."

The term "permanent residence" adopted in the *Armstrong* and *Pelletier* cases appears to come very close to the term "domicile." In *Black's Law Dictionary,* the

---

**8.** 575 F.2d 341 (2d Cir.1978). [23 U.C.C.Rep. Serv. 1354].

**9.** 575 F.2d at 342.

**10.** 95 Mich.App. 45, 290 N.W.2d 401 (1980) [28 U.C.C.Rep.Serv. 1187].

**11.** 7 U.C.C.Rep.Serv. 781, Bankr.L.Rep. ¶ 63,541 (Bankr.W.D.Ok.1970).

**12.** The creditor lost the automobile to a trustee in bankruptcy, however, because of a failure of the creditor to refile in County "B," when the home in "A" was sold and the debtor's family moved to "B" to live with him. The state statute contained a "chase the debtor" requirement of refiling in four months when a debtor established residence in a different county. *Id.*

**13.** 5 U.C.C.Rep.Serv. 327, Bankr.L.Rep. ¶ 62,802 (Bankr.D.Me.1966).

**14.** *Id.* at 331.

terms "domicile" and "residence" are distinguished: [15]

> As "domicile" and "residence" are usually in the same place, they are frequently used as if they had the same meaning, but they are not identical terms, for a person may have two places of residence, as in the city and country, but only one domicile. Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one's domicile. *Fuller v. Hofferbert,* C.A.Ohio, 204 F.2d 592, 597 (1953). "Residence" is not synonymous with "domicile," though the two terms are closely related; a person may have only one legal domicile at one time, but he may have more than one residence. *Fielding v. Casualty Reciprocal Exchange,* La.App., 331 So.2d 186, 188 (1976).

In *Knapp, supra,* Chief Judge Kaufman refused to adopt an argument that the debtor's intention, as expressed to a creditor, is controlling in determining the debtor's "residence," [16] which would appear to be a rejection of a conclusion that "domicile" or "permanent residence" are equivalents for the term "residence" in *U.C.C.* § 9–401(1).

To interpret the requirement that a financing statement be filed in the county of the debtor's residence as meaning that it may be filed in either of two counties, when the debtor has places of residence in different counties, might appeal to the champions of the rights of creditors dealing in secured credit transactions—but only until some relatively innocent subsequent creditor suffered a severe loss from having searched the records and found nothing in one of the two counties, having no information that the debtor possessed a residence in some other county. Besides, the direction is not to file in *any* county of residence. As to an interpretation which would *require* filing in both counties, there is nothing in the statute to indicate that this was contemplated and intended by the legislature. Rather, the wording of the statute would seem to indicate that a single and exclusive filing is required.

As suggested, the term "permanent residence" does not appear to be satisfactory; however, it appears that a different term— "principal residence"—may offer the best interpretation of the legislative intent.

The term "principal residence" suggests that a creditor would have a better opportunity of determining the proper place of filing—when a debtor has two places of residence—than a term which rests so strongly upon a state of mind or intention as does the term "permanent residence" or "domicile." It is unnecessary here to delineate all of the factors which a creditor might reasonably consider in determining a debtor's "principal residence," and it would be an impropriety to do so. In the case here, the debtor's principal residence was at her horse farm in Clay County. She owned this piece of real property but only leased the apartment in Madison County. During the times involved in this matter, the debtor was no longer boarding any horses in Madison County, having moved all of them to Clay County; thus, the debtor's business of "raising Arabian horses" had its location in Clay County, except that some of her financial dealings were carried on with the bank at its offices in Madison County. The debtor's parents no longer lived in Madison County and

---

**15.** At 1176 (5th ed. 1979). See also Webster's Third New International Dictionary (unabridged) for "residence" at 1931 (1976).

**16.** 575 F.2d at 343. See also the rejection of interpreting "residence" to mean "permanent residence" or "domicile" in *In re McQueen,* 35 U.C.C.Rep.Serv. 1036, 27 B.R. 717 (Bankr.D.Vt. 1983), *aff'd,* 37 U.C.C.Rep.Serv. 609 (D.Vt., 1983).

were residing in Clay County. All of these facts were objective facts which a lender could have determined. The bank was aware of most of these facts and may have been aware of all of them. It would not have been unreasonable for the bank to have to determine the debtor's "principal residence" and file its financing statement in Clay County. If, of course, the bank harbored anxieties as to the proper county in which to file, under the statutory requirement for filing in the county of the debtor's residence, it could have filed in both counties, with no detriment except as to the filing fees (which probably would have been charged to the debtor).

In view of the foregoing, the bankruptcy judge concludes that the bank has failed to satisfy the Court to a reasonable degree that it is the holder of a security interest in the mare "Anna Kosandra" which is enforceable against the debtor in possession in this chapter 11 bankruptcy case.

The order granting relief to it from said stay, so as to permit the bank to enforce its security interest in said horse, was erroneous, and it is due to be set aside and the stay continued in force.

### Order

For cause, it is ORDERED by the Court that the debtor's motion for reconsideration of the order granting relief to Central Bank of the South from the stay provided by 11 U.S.C. § 362(a), so as to permit its enforcement of a security interest in the debtor's mare "Anna Kosandra," entered November 25, 1985, is granted, said order is set aside, said bank's request for relief from said stay is denied, and said stay is continued in effect as to said bank; and it is further ORDERED by the Court that the clerk send a copy hereof through the United States mails to each of the following (which shall be sufficient service and notice hereof): the debtor, her attorney, said bank, its attorneys at Gadsden and at Huntsville, and the United States trustee for this district.