**In re Thomas W. ASBRIDGE and Laura Asbridge, Debtors.**

**Bankruptcy No. 86–05104.**

United States Bankruptcy Court, D. North Dakota.

April 30, 1986.

See also, 45 B.R. 564.

James Coles, Bismarck, N.D., for debtors.

Joseph Turman, Fargo, N.D. for First Bank of South Dakota.

Sean Smith, Bismarck, N.D., for Federal Land Bank.

James Gion, Elgin, N.D., for West River Savings Bank.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court on Motions to Dismiss, simultaneously filed by First Bank of South Dakota (FIRST BANK) and Federal Land Bank of St. Paul (FEDERAL LAND BANK). As a basis for its Motion, Federal Land Bank, pointing to the Debtors' previously dismissed Chapter 11 case and a pending foreclosure, charges that the Debtors will be unable to successfully reorganize. Both First Bank and Federal Land Bank assert that the present Chapter 11 is filed in bad faith solely for the purpose of frustrating the legitimate rights of secured creditors. Responding, the Debtors claim they filed in good faith for the purpose of reorganizing. A hearing was held on March 26, 1986, and evidence was taken. Additionally, the Court takes judicial notice of the Debtors' previous bankruptcy case, *In re Asbridge*, 45 B.R. 564 (Bankr.N.D.1984), and the several adversary actions commenced in connection with that case.

### 1.

The Debtors' present Chapter 11 case was commenced by Petition filed on February 10, 1986. They previously filed for relief under Chapter 11 on March 30, 1984, but sought and obtained a voluntary dismissal of that case on April 15, 1985.

During the pendency of the original Chapter 11 case through the present, the figures have changed, but the players remain the same. First Bank and Federal Land Bank were, and continue to be, the Debtors' principal secured creditors. The original 1984 Petition set out total secured claims of $1,429,000.00, with Federal Land Bank's claim listed at $717,000.00 and First Bank's claim listed at $641,000.00. The original Schedules were amended on two subsequent occasions, the last occurring in December 1984 which had the effect of increasing total secured claims to $1,973,612.00 of which $743,668.00 pertained to Federal Land Bank and $1,164,498.00 pertained to First Bank. The Schedules filed with the Debtors' new Petition reflect a total secured debt of $1,247,637.00 of which $930,655.00 is attributed to Federal Land Bank and $224,059.00 is attributed to First Bank. The aggregate of these two claims comprise 92.55% of the total secured debt. Between dismissal of the original Petition and the present refiling, the Debtors paid off or settled with several minor secured creditors and have added several others, including a debt to his mother, Loretta Asbridge. The indebtedness currently depicted as owing to First Bank stems from a post-dismissal settlement agreement entered into between the Debtors and the Bank in November 1985 but which was breached by the Debtors' failure to make the second and final payment of $224,059.00. In consideration for a total sum of $515,000.00 cash, the Bank, by that agreement, agreed to satisfy all mortgages, promissory notes, and security; and the parties between them agreed to dismiss all pending law suits. In consequence of the agreement, the Bank did receive $290,940.00. The agreement specifies that if the final payment of $224,059.00 was not made by December 1, 1985, the Debtors would turn over ownership of cattle to the Bank. Prior to the second Chapter 11 filing, the Bank took steps in state court to specifically enforce this agreement and subsequent to the filing, commenced an adversary action in the present case seeking to reinstate its claim and security interest according to its original tenor. That adversary is presently pending.

During the pendency of the Debtors' previous Chapter 11, two adversary actions were commenced by First Bank against the Debtors, both being resolved in the Bank's favor. In the case of *In re Asbridge*, reported at 45 B.R. 564 (Bankr.D.N.D.1984), the Debtors sought to avoid the Bank's security interest insofar as it extended to property allegedly owned by Laura Asbridge. By its decision in that case, the Court found that the Debtors' obligation to the Bank was $1,109,898.00, secured by all livestock, farm machinery, equipment and real estate. Disregarding whatever remaining legal effect the November 1985 settlement agreement may have, this indebtedness has not been reduced except to the extent of the $290,940.00 payment.

Federal Land Bank has filed a proof of claim in the sum of $929,988.00 and, following the dismissal of the original Petition in April 1985, commenced a foreclosure action against the Debtors' real property. Federal Land Bank obtained a judgment of foreclosure on January 17, 1986, and a sheriff's sale was scheduled for March 11, 1986.

During the pendency of the original Chapter 11, the Debtors on two occasions sought an extension of the exclusive time period within which to file a plan. The date was extended on one occasion and, in January 1985, nine months after commencement, a disclosure statement and plan were filed. Neither were ever presented to the Court for approval.

During the pendency of the original Chapter 11, a considerable dispute arose between First Bank and the Debtors regarding the unauthorized use of cash collateral and/or the conversion of collateral. On December 31, 1984, the Debtors filed an

expedited motion for authority to use $277,-000.00 in cash proceeds derived from the sale of livestock pledged as security to First Bank. The Bank strenuously resisted and, in January 1985, commenced an adversary action alleging the Debtors to have jeopardized its security position by failing to account for livestock and by the unauthorized use of cash collateral. By this adversary, the Bank sought a restraining order prohibiting the use of any cash collateral without its authorization or court order and additionally asked for a complete accounting of all collateral used as well as a replacement lien for any so used. A hearing on the Debtors' Motion for use of cash collateral was held on January 16, 1985, in conjunction with the trial of the adversary. The evidence presented satisfied this Court that the Debtors had moved secured livestock to another state without advising the Bank and that they had not accounted to the Bank for sale proceeds and failed to deposit proceeds in a cash collateral account. In consequence, the Debtors' Motion for use of cash collateral was denied, and a permanent injunction was entered enjoining the Debtors from using any cash collateral without consent of the Bank or court order and further requiring an accounting of all collateral used and directing they afford the Bank a replacement lien in the amount of $50,-000.00. The Order of denial was entered on January 29, 1985, and the injunction was entered on January 22, 1985.

On March 19, 1985, Federal Land Bank filed a Motion for Relief From Stay which was joined in by First Bank. A hearing was scheduled for April 9, 1986, but never took place because of an intervening voluntary motion by the Debtors for dismissal. On April 3, 1985, the Debtors filed a Motion for Dismissal, and on April 15, 1985, the case was dismissed with prejudice to a subsequent filing within 180 days.

Following dismissal of the original Petition, the Debtors continued to operate their cattle operation in pretty much the same fashion they did during 1984. All ranch income is derived from the sale of cattle, and Tom Asbridge believes that, with time,

he will be able to pay off both First Bank and Federal Land Bank and will be able to generate more money for them through operation than by liquidation. He has presently on hand 520 bred cows, 490 1985 calves and expects a 1986 calf crop of around 500 head. He would like to obtain a few hundred yearlings but has as of yet not done so. His present livestock numbers are a considerable decline from past years. The Disclosure Statement filed in January 1985 depicted 1,527 heifers and 420 steers. Nonetheless, Mr. Asbridge believes his operation is in a better position to survive now than previously due principally to the settlement agreement with First Bank which he believes is still viable. This agreement is the principal positive change in the Debtors' operation since dismissal of their formal Chapter 11 Petition, and Mr. Asbridge acknowledges that if the obligation to First Bank is restored to its original tenor, it would be extremely difficult for them to reorganize.

Subsequent to dismissal of the previous Petition, the Debtors engaged in a series of cash transfers between themselves, family members, and others. The Debtors formerly maintained cash collateral accounts at West River Savings Credit Union, all of which were subject to this Court's January 1985 permanent injunction. Although the documentary evidence is very involved, it does establish that on April 16, 1985, the day after dismissal of the original Chapter 11 Petition, Debtor, Tom Asbridge, withdrew all funds then on deposit in three Debtor-in-Possession accounts and the account of Horse Shoe Cattle Company. The money from these accounts variously found its way into loan repayments as well as the accounts of the Debtors' children, Tom Asbridge's mother, Loretta Asbridge, and the account of a company known as Farm Law Institute, these accounts also being with West River Savings. $50,000.00 was transferred into his daughter's accounts, and a total of $66,000.00 found its way into his mother's account. Almost on the heels of these transfers, withdrawals were made from the several children's accounts by

Tom Asbridge. Loretta Asbridge professed at the hearing not to know where the $66,000.00 came from, yet the documents reveal that on April 23, 1986, she caused West River Savings to issue her cashier's checks which she then deposited into her personal checking account with Grant County State Bank. From her checking account, she drew a series of three checks. Two, totalling $52,000.00, were payable to Tom Asbridge; and the other, payable in cash, also was given to Tom Asbridge.

Tom Asbridge was an officer of Farm Law Institute and, on May 5, 1985, he drew on the company's account the sum of $3,000.00. He also had money deposited in his attorney's trust account and, on April 2, 1985, as debtor-in-possession, received from his attorney's account the sum of $27,-117.35. Although denying that he had a personal checking account on April 16, 1985, the documents reveal that on that date the Debtor transferred $10,000.00 into his checking account. Numerous other post-petition transfers, deposits and withdrawals were made and the foregoing is by no means a complete recount of them. At the hearing, Tom Asbridge testified that all money was spent but accounted for. However, it can be concluded from the evidence that all transfers were for the benefit of the Debtors, and virtually all cash found its way into the possession of Tom Asbridge. The money was used for ranch operation, for debt repayment and for commodity trading. It is impossible to trace the myriad of fund transfers completely. In deposition testimony, Tom Asbridge denied having records of income and expenses yet at the hearing stated that all funds and expenses were accounted for and that the total funds transferred from the Credit Union totaled $100,000.00. The documentary evidence counters this assertion. A ledger introduced by Mr. Asbridge as being the Debtors' income sheet for 1985 does not reflect any transfers of income from prior debtor-in-possession accounts. Nor does the money transferred from the debtor-in-possession accounts show up on any other records introduced by him. The documentary evidence establishes that at least $150,000.00 was transferred at Tom Asbridge's direction from debtor-in-possession accounts and his attorney's trust account into various other accounts and from there into the Debtors' pocket. What became of it subsequently is impossible to discern from the evidence.

Mr. Asbridge admits that his major problem today is with First Bank and Federal Land Bank and that, while the settlement agreement with First Bank was favorable to him, he was unable to come up with the funds necessary to make the final payment. He acknowledged at the hearing that the agreement specified turnover of collateral as an alternative but that he sought a refinancing source rather than selling the cattle as required by the agreement. Thusfar, he has been unsuccessful in finding an alternative source of financing in order to comply with the agreement terms. As previously noted, according to Mr. Asbridge, it will be very difficult to reorganize if the indebtedness to First Bank is restored to its original, uncompromised amount. He acknowledged that the principal reason for the renewed Chapter 11 Petition is the breach of the settlement agreement and First Bank's efforts to enforce it in state court. He also stated that the filing was additionally precipitated by Federal Land Bank's foreclosure. After the struggle of the past several years, Mr. Asbridge indicated he would like to hold his operation together and believes his business can turn around principally through the November 1985 agreement with First Bank.

2.

Section 1112(b) of the Bankruptcy Code provides that upon request of an interest party, a Chapter 11 case may, after notice and hearing, be dismissed for "cause". Cause for dismissal is not limited to the specifically enumerated example set out in a section but rather is a matter of discretion with the Bankruptcy Court. *In re Witkowski,* 41 B.R. 723 (Bankr.N.D. 1984). There is, in the Code, an implied requirement of good faith in the filing of any bankruptcy petition. *In re Condomin-*

*ium Ass'n. of Plaza Towers South, Inc.,* 43 B.R. 18 (Bankr.S.D.Fla.1984); *In re 2218 Bluebird Ltd. Partnership,* 41 B.R. 540 (Bankr.S.D.Cal.1984). The absence of good faith on the part of a debtor in filing a petition is sufficient cause for its dismissal. *In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984); *In re Thirtieth Place, Inc.,* 30 B.R. 503 (Bankr.9th Cir.1983). In finding a lack of good faith, courts emphasize an intent to abuse the judicial process; particularly where there is no realistic possibility of reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors. *In re Albany Partners,* 749 F.2d at 674. A lack of good faith exists where at the outset, the debtor is not a viable economic entity and it is obvious that the petition was filed for the sole purpose of frustrating and delaying legitimate efforts of secured creditors to enforce their rights. *Matter of Southern Communities, Inc.,* 57 B.R. 215 (Bankr.M.D.Fla.1986). In the *Southern Communities* case, the debtor's principal asset was already involved in a foreclosure action, and the company was not economically viable having never generated sufficient cash flow to even service the mortgages let alone operating expenses. In concluding that the case must be dismissed for cause, the court said "one need not engage postulating to conclude that by some magic all of a sudden this frog will turn into a prince and will be ready to proceed toward a fruitful economic life". *Matter of Southern Communities, Inc.,* 57 B.R. at 218. Some courts feel that any doubt arising in a section 1112 dismissal motion ought to be resolved in favor of allowing the debtor to continue with reorganization efforts. This Court has ascribed to this view where there as yet exists a reasonable amount of unencumbered assets and there remains an operational feasibility. *In re Witkowski, supra.* However, this Court will not close its eyes to obvious situations of abuse. The record in this case indicates that the Debtors' present Chapter 11 filing was precipitated by the immediacy of Federal Land Bank's foreclosure, coupled with the Debt-

ors' inability to satisfy a favorable settlement stipulation with First Bank, a stipulation without which reorganization is, for all practical purposes, impossible. Continued viability of this stipulation is the centerpiece of the Debtors' present reorganization effort without which, as acknowledged by the Debtors themselves, would be extremely difficult. The record suggests that very little, if anything, in a positive nature has changed in the Debtors' financial circumstances beyond this certain stipulation and, if anything, they are in a worse position illustrated by the fact they now have fewer cattle than they did during their first Chapter 11 case.

Since dismissal of the previous filing, the Debtors engaged in a calculated scheme to remove and secrete funds which formerly were, in part, cash collateral belonging to First Bank, the effect of which is to further dilute the Bank's security position going into the second Chapter 11 filing. On the eve of dismissing the first Chapter 11 case, the Debtors and First Bank were very distrustful of each other, and the Debtors had commenced a state court action against the Bank. This animosity has by no account lessened since dismissal but quite possibly, due to the Debtors' breach of the stipulation and the Bank's attempted enforcement, has dramatically increased. It is likely that litigation with First Bank will continue, and the Debtors as their first order of business will be to once again pick up the gantlet in state court.

The Debtors' faith in the continued viability of this settlement stipulation is by no means a certainty. The Bank has commenced an adversary action seeking restoration of the full indebtedness for the reason that the breach avoided the agreement. The stipulation provides that the Bank will satisfy all notes and mortgages in consideration of a payment of $515,000.00, a payment which has not been made. It is unlikely, in view of the case law that this agreement could be considered as a novation. Essentially, the Debtors argue that the settlement agreement was and remains a substitution for their original obligation.

The intent to discharge an original obligation by novation must be clear and definite. This Court has so ruled in the case of *In re Miller*, 54 B.R. 710 (Bankr.N.D.1985). In the present case it appears that the agreement between the parties was that the original notes and mortgages would be cancelled only if all cash payments were received. It preliminarily appears very unlikely that the settlement agreement can long serve as the basis for the Debtors' renewed reorganization hopes. If the indebtedness to First Bank is restored to its original amount, reorganization is virtually impossible given the assets remaining and the extent of the indebtedness.

But one conclusion can be reached and that is that the sole basis for the Debtors renewed filing was to forestall the legitimate efforts of secured creditors rather than any realistic hope of reorganization. In view of the foregoing discussion and applying the case law to the facts as outlined herein, the Court concludes the present case should be DISMISSED for cause pursuant to section 1112(b) for the reason that it was not filed in good faith.

Accordingly, IT IS ORDERED, that the Motion to Dismiss filed by First Bank of South Dakota and Federal Land Bank of St. Paul is GRANTED and the Debtors' Chapter 11 petition filed February 10, 1986 is hereby DISMISSED.