**In re SPECTEE GROUP, INC., Debtor.**

**Bankruptcy No. 94 B 45451 (SMB).**

United States Bankruptcy Court,
S.D. New York.

Aug. 14, 1995.

Zeichner Ellman & Krause (Nathan Schwed, Peter Janovsky, of counsel), New York City, for Fourth Federal Sav. Bank.

Aaron Gelbwaks, New York City, for debtor John Souto and respondent pro se.

Bizar & Martin, L.L.P. (Perry Young, of counsel), New York City, for 240 West 23rd Associates.

## MEMORANDUM DECISION GRANTING MOTION FOR SANCTIONS

STUART M. BERNSTEIN, Bankruptcy Judge.

Fourth Federal Savings Bank ("Fourth Federal"), a secured creditor, seeks sanctions against the Debtor ("Spectee"), its president, John Souto ("Souto"), and its counsel, Aaron Gelbwaks ("Gelbwaks") (collectively, the "Respondents") pursuant to 11 U.S.C. § 105 and

Bankruptcy Rule 9011 and against Gelbwaks pursuant to 28 U.S.C. § 1927 for reimbursement and payment of Fourth Federal's attorneys fees and expenses.

From start to finish, the Respondents manipulated the bankruptcy process in this single asset case solely to prevent Fourth Federal from foreclosing its mortgage. The Respondents testified falsely, proffered backdated documents and proposed a plan they knew they could never confirm. As a result, the Court conducted numerous, time-consuming hearings which, in the final analysis, proved unnecessary and an utter waste of time. The Respondents filed and prosecuted the Spectee case in bad faith, and their conduct warrants sanctions.

### FACTS

#### A. The Realty Case

The story of this case actually begins in May 1994, six months before it was commenced. At that time, Fourth Federal held a leasehold mortgage on certain storefront or commercial space located at 240 West 23rd Street, a residential co-operative building, in New York City. The space was leased to an entity known as 23240 Realty Corp. ("Realty"), a corporation owned equally by the Respondent, John Souto and his father, Serge Souto. Aside from the leasehold, Realty had no other assets. Fourth Federal had recovered a judgment of foreclosure,[1] and had scheduled the foreclosure sale for May 24, 1994.

Realty filed a chapter 11 petition on the day of the sale. By then, Realty owed Fourth Federal approximately $840,000.00 secured by the leasehold mortgage. Neither the petition nor any other document subsequently filed by Realty identified Citibank—who Realty apparently owed $1.5 million—as a creditor.

Fourth Federal immediately moved to dismiss the Realty petition, or alternatively, for relief from the automatic stay. The Court initially denied these motions, and instead, directed Realty to file a plan and disclosure

---

1. One of the parties named in the foreclosure suit was Citibank, N.A. Citibank held a second mortgage that, according to the Respondents, secured a $1.5 million debt. The amount owed to Fourth Federal exceeded the value of the leasehold, leaving Citibank completely undersecured.

statement which it eventually did on or about October 12, 1994. The plan classified Fourth Federal as secured creditor, and proposed to pay it $300,000.00. According to Souto, this amount represented the estimated value of the leasehold at that time.

On October 14, 1994, the Court conducted a hearing to consider Fourth Federal's renewed motions to dismiss or for stay relief against the backdrop of Realty's plan. Fourth Federal argued that the plan was not confirmable as a matter of fact or law. The plan proposed to pay Fourth Federal $300,-000.00, but Fourth Federal had procured an appraisal that valued the property at $440,-000.00. Tr. 10/14/94 at 4.[2] Further—and more important—under the Realty plan, Fourth Federal held an unsecured claim of $538,000.00, and the remaining undersecured debt scheduled by Realty totalled only $432,-000.00. Id. Hence, no impaired class existed that could accept the plan. Id. at 5.

Gelbwaks, Realty's attorney, offered little to refute this. Ever the optimist,[3] Gelbwaks stated that Realty was very close to signing a new sublease, id. at 12, and settling with Fourth Federal. Id. at 14–15. Fourth Federal refuted this, stating that no deal was in the works. Id. at 15. Gelbwaks also speculated that there might be some additional unsecured debt relating to counsel fees and promotional expenses but could not identify how much or why these debts had not been scheduled. Id. at 13–14.

The Court concluded that Realty could not obtain an accepting, impaired class once Fourth Federal cast its inevitable negative vote. Accordingly, Realty's plan was unconfirmable as a matter of law, and the Court dismissed the case. Id. at 16–17.[4] Realty

never appealed from the dismissal order, and Fourth Federal rescheduled its foreclosure sale for November 23, 1994.

## B. The Spectee Transfer and Immediate Filing

On or about November 21, 1994, Realty transferred the lease—its only asset—to Spectee, and Spectee assumed Realty's obligations (the "Spectee Transfer"). These obligations included the Fourth Federal mortgage debt, by now approximately $850,000.00, unsecured debt in the amount of $432,246.00, and the $1.5 million debt to Citibank. As a result, Spectee received property valued at $300,000.00 in the Realty case, and at the same time, assumed obligations exceeding $2.3 million.

Two days later, Spectee filed its chapter 11 petition, automatically staying the foreclosure sale scheduled for the next day. The Spectee petition literally mirrored the Realty petition; the Respondents merely "whited out" Realty's name, taxpayer identification number and the dates on the Realty petition, and replaced them with those of Spectee. The lists of creditors are exact duplicates and neither includes Citibank. Both petitions even misspell Gelbwaks' name as "Gelwaks", omitting the letter "b".[5]

## C. Subsequent Bankruptcy Proceedings

After receiving notice of the Spectee petition, counsel to Fourth Federal wrote to Gelbwaks on November 28, 1994, stating that the Spectee filing was a sanctionable abuse of the bankruptcy process, and if Spectee did not immediately dismiss the case, Fourth Federal would seek sanctions against Realty, Spectee, their principals and counsel. The

---

**2.** "Tr [date]" refers to the transcript of the hearing held on the date indicated.

**3.** Gelbwaks is an optimist only in the sense that he is "[a] proponent of the doctrine that black is white." Ambrose Bierce, *The Devil's Dictionary* 94 (Dover ed. 1958).

**4.** Throughout these proceedings, Realty never mentioned that Citibank held a $1.5 million unsecured claim. If Citibank voted its claim in favor of a Realty plan, Realty could have obtained an accepting impaired class, despite Fourth Federal's negative vote.

**5.** The Spectee petition contained another misstatement that had appeared in Realty's petition. It indicated, on the first page, that the estimated value of Spectee's assets ranged between $500,-000 and $999,000. In addition, the accompanying affidavit of John Souto, submitted in accordance with Rule 52 of the Local Bankruptcy Rules of this Court, and notarized by Gelbwaks, stated that the Debtor had assets of approximately $800,000.00. At the October 14 hearing in the Realty case, these Respondents valued this same, single asset at only $300,000.00.

Respondents refused to dismiss the case, and Fourth Federal moved, in the alternative, for dismissal or for relief from the automatic stay. Fourth Federal simultaneously moved, by separate application, to hold the Respondents in contempt and for an award of sanctions.

Fourth Federal's motions came before the Court on December 12, 1994. During the hearing, Gelbwaks provided insight into the Spectee Transfer, a transaction slapped together in haste, without documentation or any formality, which accomplished nothing beyond a name change:

> THE COURT: According to the Spectee petition which you signed in this case certain unsecured claims are identified.
>
> What are the basis of those obligations from Spectee's point of view?
>
> MR. GELBWAKS: Spectee has assumed them.
>
> THE COURT: Is that pursuant to a written document?
>
> MR. GELBWAKS: No, Your Honor. What we did was Spectee picked up the obligations of the prior owner.
>
> THE COURT: How did it go about doing that?
>
> MR. GELBWAKS: Just picked them up, that was the understanding between the two corporations.

> THE COURT: Who represented Spectee in connection with that understanding?
>
> MR. GELBWAKS: I did.
>
> THE COURT: Who represented the original Debtor, what was it, 23240 Realty?
>
> MR. GELBWAKS: I did.
>
> THE COURT: So you negotiated with yourself?
>
> MR. GELBWAKS: Yes.
>
> THE COURT: What consideration was given with respect to the assignment of those?
>
> MR. GELBWAKS: The asset of the corporation. The new corporation took over all the assets and liabilities of the prior corporation. It was, in essence, a change of form.
>
> THE COURT: So you are telling me it's the same Debtor with the same obligations?
>
> MR. GELBWAKS: Yes, exactly.

Tr. 12/12/94 at 9–10.[6]

After hearing the arguments of counsel, the Court granted Fourth Federal's motion for relief from the automatic stay, finding that the Spectee petition had been filed in bad faith, and was "obviously just a subte[r]fuge to circumvent the dismissal of the prior case." *Id.* at 12–13.[7] Fourth Federal

---

**6.** Despite this statement from the architect of the Spectee Transfer, the Respondents produced supposedly contemporaneous documentation relating to the transfer at subsequent hearings. These included an Assignment (Respondents' Exhibit ["RX" 9]) and an Assignment and Assumption Agreement (RX 10), both dated November 21, 1994, signed only by Souto, and in the case of the latter, notarized by Gelbwaks. Under these agreements, Realty transferred its only asset to Spectee, and Spectee assumed all of Realty's obligations, including the $1.5 million Citibank claim which was expressly mentioned.

The specific reference to the Citibank claim in the Assignment, together with other evidence, compels the conclusion that the Respondents created the transfer documents after December 12, 1994, and then backdated them to "validate" the Spectee Transfer. First, the Spectee petition did not identify the Citibank claim, although the petition is dated only one day after the Assignment (RX 9) which specifically mentions it. Similarly, the petition annexes an affidavit pursuant to Local Bankruptcy Rule 52 that Souto signed and Gelbwaks notarized on November 22, 1994. Souto's affidavit estimates that Spectee's liabilities total only $1.1 million. This strongly implies that the Respondents did not "discover" the Citibank claim until after the purported date of the Assignment which mentions it.

Second, Souto never recorded the lease assignment to Spectee although he had recorded seven prior assignments involving this leasehold. Transcript of Sanctions Hearing ("Sanctions Tr."), held Feb. 27, 1995, at 168–69. Souto doubtless failed to record this last assignment because although the Respondents could backdate the transfer documents, they could not backdate the recording date.

**7.** On December 12, 1994, the Court also denied, without prejudice, the motion for contempt and sanctions because the contempt motion did not specify whether civil or criminal contempt was sought. *See* Fed.R.Bankr.P. 9020(b) (contempt motion shall "describe the contempt as criminal or civil."). On or about December 29, 1994, Fourth Federal re-served its motion for sanctions, but did not renew its motion for contempt.

rescheduled the foreclosure sale for January 10, 1995.

Undaunted by its prior failure, Spectee continued to take steps to halt the January 10 foreclosure sale. On or about December 23, 1994, Gelbwaks submitted an order to show cause and application (Movant's Exhibit ["MX"] U) seeking a temporary restraining order to enjoin the sale. The crux of the motion was Spectee's position that it could propose a confirmable plan. The application annexed an unsigned eight page disclosure statement describing a plan that was not attached. The Spectee "plan" depended upon entering into a sublease (which it had not done) and receiving a $30,000.00 contribution from its shareholders. Because Spectee requested immediate injunctive relief, the Court directed the parties' counsel to attend a chambers' conference on December 27, 1994. At that conference, which was not transcribed or recorded, the Court refused to sign the order to show cause because Spectee had failed to commence an adversary proceeding seeking injunctive relief. *See* Fed. R.Bankr.P. 7001(7).

On or about January 5, 1995, Spectee filed a complaint (MX V) commencing an adversary proceeding against Fourth Federal to reinstate the automatic stay and prevent the foreclosure. The complaint, signed by Gelbwaks, alleged that Spectee was entitled "by reason of the submission of a confirmable reorganization plan, to have the lifting of the automatic stay cancelled by further order of this Court." Spectee simultaneously submitted an application and order to show cause (MX W), again seeking a temporary restraining order enjoining the foreclosure sale.

The Court conducted a hearing on January 6, 1995 before signing the new order to show cause. This order to show cause was based upon an unsigned disclosure statement describing a plan that proposed to pay Fourth Federal $215,000.00 and unsecured creditors $35,000.00 from funds borrowed from a third party.

The disclosure statement did not, however, state the source of this borrowing. Gelb-

waks nevertheless assured the Court that Spectee had a commitment to borrow the $250,000.00 that it needed:

> THE COURT: In your plan you propose to pay Fourth Federal Savings $215,000 on the effective date. Where is that money going to come from?
>
> MR. GELBWAKS: We have arranged with a lender for the funds.
>
> THE COURT: Where does your Disclosure Statement say that?
>
> MR. GELBWAKS: I don't believe it does, Your Honor.
>
> THE COURT: What is the name of the lender?
>
> MR. GELBWAKS: Robert Sealer [*sic*] of RHS Collections Incorporated.
>
> THE COURT: What is the nature of the commitment?
>
> MR. GELBWAKS: The commitment is to provide $250,000 or additional sums if needed to effectuate the plan. The way we have it structured now, unless they made a Section 1111(b) election they would get $215,000, the unsecured would get 35 for a total of $250,000.

Tr. 1/6/95 at 4–5.

The Court denied Spectee's request for a temporary restraining order, and scheduled a preliminary injunction hearing for January 9, 1995, one day before the scheduled foreclosure sale. At that time, Spectee would have the opportunity to "produce the evidence of your ability to fund this plan and convince me that you have a feasible plan." *Id.* at 27. The Court also issued the following warning to Gelbwaks:

> [Gelbwaks] made a representation in Court that his client has the wherewithal through borrowed funds, and its personal funds, to confirm a feasible plan. If that turns out not to be the case, he will be subject to sanctions, as another attorney was just sanctioned in this Court, in another single asset case.[8] So he is going to have his

8. This referred to Judge Brozman's decision in *In re French Bourekas, Inc.*, 175 B.R. 517 (Bankr. S.D.N.Y.1994).

chance on Monday to prove what he just said.

*Id.* at 28–29.

Spectee went forward on January 9, 1995, based on yet another plan and disclosure statement.[9] (MX X). The new and ultimately final plan provided that Spectee would pay out the Fourth Federal claim over an approximate 26 year period. The plan assumed (and required) that after the first year, Spectee would sublet its leasehold for a continuous 25 year period, enjoying periodic rent escalations. The plan also provided that the shareholders would contribute $35,000.00 to pay the unsecured claims. According to the disclosure statement, they would also contribute an additional $40,000.00 to operate the property.

At the beginning of the hearing, Gelbwaks reiterated that Spectee had a financing commitment, including the $40,000.00 it would need to cover one year of leasehold expenses while the property was vacant and without a subtenant:

> MR. GELBWAKS: We have obtained a commitment to borrow $75,000, $35,000 to fund a second lien and $40,000 for one year's working capital. We anticipate within one year we will rent the premises which is a reasonable assumption.

Tr. 1/9/95 at 10.

John Souto also testified about the financing commitment.[10] He said that he intended to borrow the funds (from R.H.S.), and contribute them to Spectee. Like Gelbwaks, he assured the Court that Spectee had an unwritten commitment to fund the plan payments to the unsecured creditors in addition to one year of expenses while the property remained vacant. He testified that his inves-

tor said he could "deliver the certified checks to Mr. Gelbwaks' account" within two days, *id.* at 44–45, and also testified as follows:

> Q: Have you arranged for any additional funds to be available to Spectee Corp.?
> A: Yes, my investor has additionally agreed according to the plan to come up with another $40,000, making a total of $75,000, $35,000 of which will go to the unsecured creditors and $40,000 in an escrow account to be used for one year of funding at approximately $3,000 a month, okay? Which will come out to $36,000 instead of $40,000.
>
> In the event that we can't find a tenant immediately for the premises, we are allowing one year to rent the premises. . . .

*Id.* at 45.

Souto repeated his testimony regarding the nature and strength of this commitment as the hearing wore on. During cross-examination, he defended the unwritten nature of the commitment, assuring the Court that it was nevertheless real and immediate:

> A: Okay, I got a verbal commitment from him [R.H.S.], if you want that money in an account tomorrow, we will put it in an account tomorrow. Certified check for $75,000. What's today, Monday? Excuse me, on Wednesday.

*Id.* at 98.

At the close of the testimony, the Court denied Spectee's motion for a preliminary injunction.[11] The Court concluded that Spectee had failed to show that its plan was feasible or fair and equitable. *Id.* at 140–43. Finally, the Court concluded that the plan had not been proposed in good faith, and that the Spectee transfer served no legitimate business purpose.[12] *Id.* at 144.

---

**9.** During the January 6 hearing, Fourth Federal made an election pursuant to 11 U.S.C. § 1111(b). Spectee's January 6 plan failed to account for that possibility, so Spectee proposed a new plan, presented on January 9, which did.

**10.** In addition to Souto, Spectee proffered the testimony of Malcolm Newman, an appraiser, who valued the property at $215,000.00. The Court concluded that his testimony lacked probative value, but it is unnecessary to explain this conclusion for the purpose of this opinion.

**11.** During the afternoon session, Gelbwaks stated that the state supreme court had stayed the foreclosure sale scheduled for the following day. This removed the immediate threat, but both parties felt it important that the Court decide the motion. Tr. 1/9/95 at 134.

**12.** The Respondents could not provide a coherent business rationale for the transfer; Souto practically admitted that it was conceived to dupe potential sublessees who might be put off by bankruptcies and foreclosures. Tr. 1/9/95 at 60, 62. Gelbwaks's testimony at the sanctions

## D. Hearing on the Motion for Sanctions

The hearing on Fourth Federal's sanctions motion made clear that the Respondents never had the financing commitment they said they had. In addition, it demonstrated that Spectee proposed a plan dependent on a financing commitment wholly inconsistent with anything that R.H.S. was ever willing to consider. While some of the Spectee plan assumptions (*e.g.*, a continuous, rising rental stream for 25 years) can be dismissed as fanciful hopes, the many representations regarding the financing commitments were out and out lies.

The testimony by Robert Sedrish of R.H.S. Collections, Inc., which the Court finds to be credible, highlighted these falsities. He stated that he was only *considering* funding, and as a condition, required the debtor to execute a sublease. Sanctions Tr.[13] at 31. He emphasized that he *never* had an agreement to lend any money to Souto, and more important, would never lend money unless Spectee produced an executed sublease. On direct examination, Sedrish first testified as follows:

> Q: Did there come a time that you met with Mr. Souto or spoke with him in connection with the financing of the store lease for ninety-nine years at 240 West 23rd Street, New York City?
>
> A: Yes.
>
> . . . .
>
> Q: Did this financing contemplate a complete financing of the mortgage position held by Fourth Federal Savings Bank?
>
> A: Yes.
>
> Q: Did you investigate this matter thoroughly?
>
> A: Yes.

> Q: What conclusion did you come to, if any?
>
> A: I was positively inclined to go forward on a loan. There were a couple of conditions I wanted to satisfy, *one of which was the execution of the lease that I had been told was forthcoming?*

*Id.* at 30–31 (emphasis added).

On cross-examination, Sedrish reiterated that the financing "commitment" was based upon the execution of a sublease:

> Q: Did you have a tentative deal with Mr. Souto at that time?
>
> A: I had conversations with him. I didn't have a deal where, you know, he was going to give me X and Y or anything else. I had conversations. There were things that needed to be done, *one of which was a lease.*

*Id.* at 35 (emphasis added).

Even Gelbwaks eventually acknowledged this unfulfilled condition although he apparently failed to recognize the difference between the commitment that he represented existed and the commitment that Sedrish had considered. He testified in his own defense

> [t]hat financing had been arranged by the lender who testified in this Court under oath and was cross-examined, who was prepared to fund and finance this matter, waiting only for a lease to be signed. . . .

*Id.* at 306.

Spectee never had an unconditional financing commitment although the Respondents testified, represented and sought to delay Fourth Federal's foreclosure sale on the premise that it did. Further, R.H.S. never even considered funding Spectee without an

---

hearing was even more startling—he candidly admitted that the transfer was intended to deceive the prospective sublessee's attorney who was careful and strict and checked every document. Sanctions Tr. at 307. The Respondents decided to transfer the lease to a "fresh, brand new corporation, so that it would not be obliged to have lengthy discussions, negotiations, over the status of the lessor, because the attorney would, as a matter of course, order a judgment and lien search, bankruptcy search, and every other search, prior to signing this lease." *Id.*

It is mind-boggling to hear testimony from an attorney implying that the Spectee transfer

served a legitimate business purpose because it concealed Realty's bankruptcy and Fourth Federal's foreclosure from a diligent and careful attorney representing the prospective sublessee. This hardly improves upon the Court's original suspicion—to which it continues to adhere—that the Spectee Transfer was a subterfuge to enable the Respondents to recycle the Realty case under a new name.

**13.** "Sanctions Tr." refers to the pages of the transcript of the sanctions hearing. The transcript covers three days, and the pages are numbered consecutively.

executed sublease which Spectee never had.[14] Yet Spectee proposed a plan which assumed R.H.S. funding to cover expenses for one year while the leasehold remained vacant and Spectee looked for a tenant.

## DISCUSSION

Fourth Federal seeks sanctions under Fed. R.Bankr.P. 9011, 11 U.S.C. § 105[15] and 28 U.S.C. § 1927. Each addresses certain types of wrongful conduct, and is directed at particular wrongdoers. Because the bankruptcy court's inherent authority reaches farthest and widest, the Court will address it first.

### A. Sanctions Under the Court's Inherent Power

■■■ A Court has inherent authority to supervise and control its own proceedings, and to require the payment of the other party's attorney's fees by one who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)) (internal quotations omitted), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Although originally conceived under an exception to the American Rule permitting attorney's fees against the losing party, *see Hirschfeld v. Board of Elections*, 984 F.2d 35, 40 (2d Cir.1993); *Oliveri v. Thompson*, 803 F.2d at 1272, the Supreme Court has made it clear that a federal court has the power to sanction the winner as well as the loser. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 53, 111 S.Ct. 2123, 2137, 115 L.Ed.2d 27 (1991); *accord Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir. 1995).

■■■ The inherent power to sanction "stems from the very nature of courts and their need to be able to 'manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *United States v. International Bd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir.1991). It is not limited to bad faith filings; the Court can award sanctions either for commencing or for continuing an action in bad faith, vexatiously, wantonly, or for oppressive reasons. "'[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Oliveri v. Thompson*, 803 F.2d at 1272 (quoting *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973)) (internal quotations omitted); *see Milltex Indus. v. Jacquard Lace Co.*, 55 F.3d at 37–38 ("[A] court may impose attorney's fees under its inherent power as a penalty for misconduct during the course of litigation."). Further, the Court can award sanctions under its inherent authority against an attorney as well as a party. *Oliveri v. Thompson*, 803 F.2d at 1273.

### 1. Bad Faith Filing

■■■ The hallmark of bad faith is the attempt to abuse the judicial process. *In re Asbridge*, 61 B.R. 97, 102 (Bankr. D.N.Dak.1986). The bad faith inquiry focuses on the debtor's "honesty of intention," and requires the bankruptcy court to determine whether the debtor misrepresented facts in its submissions, unfairly manipulated the Bankruptcy Code, or otherwise proposed a plan in an inequitable manner. *In re Johnson*, 708 F.2d 865, 868 (2d Cir.1983). Bad faith exists where the debtor lacks any realistic possibility of reorganization, and files the petition for the sole purpose of frustrating and delaying its secured creditor's efforts to enforce its legitimate rights. *In re Beswick*, 98 B.R. 900, 903 (Bankr.N.D.Ill.1989); *In re Asbridge*, 61 B.R. at 102; *cf. In re*

---

14. Henry Leung, the principal of the potential sublessee that Souto and Sedrish had discussed, *see* Sanctions Tr. at 32–33, testified that he did not sign the sublease—forwarded to him in early December 1994—because he didn't have the money and he thought the space was too small. *Id.* at 139–40.

15. Section 105(a), the bankruptcy analogue to the All Writs Statute, 28 U.S.C. § 1651, authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This language is sufficiently broad to empower the bankruptcy court to award sanctions in conjunction with its inherent powers discussed in the succeeding text.

*Cohoes Indus. Terminal, Inc.,* 931 F.2d 222, 227 (2d Cir.1991) (A chapter 11 filing is frivolous under Rule 9011 "if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings.").

Serial filings are a "badge" of bad faith. *In re Eatman,* 182 B.R. 386, 392 (Bankr.S.D.N.Y.1995) (and cases cited therein). It is true that *res judicata* does not bar the refiling of a second bankruptcy case after the first has been dismissed, *In re Beswick,* 98 B.R. at 904, and accordingly, the successive filings do not constitute a *per se* violation of the Bankruptcy Code. *In re Johnson,* 708 F.2d at 868. Nevertheless, to justify a second chapter 11 filing following the dismissal of a prior case, the debtor must show an unanticipated change in circumstances. *In re Elmwood Dev. Co.,* 964 F.2d 508, 511 (5th Cir.1992); *In re Roxy Real Estate Co.,* 170 B.R. 571, 574 (Bankr.E.D.Pa.1993) (material change in financial circumstances demonstrating that the second case will succeed where the first case failed); *In re Savannah, Ltd.,* 162 B.R. 912, 915–16 (Bankr.S.D.Ga. 1993) (unforeseen change in circumstances); *see In re Asbridge,* 61 B.R. at 102 (the record in the debtor's current chapter 11 failed to reflect a positive change in circumstances since the previous chapter 11); *cf. In re Metz,* 820 F.2d 1495, 1498 (9th Cir.1987) (successive chapter 13 petitions require *bona fide* change in circumstances); *In re Johnson,* 708 F.2d at 868 (same); *In re Fuhrman,* 118 B.R. 72, 74 (Bankr.E.D.Mich.1990) (where filing of chapter 12 petition came approximately five weeks after dismissal of prior chapter 12 case, debtor had to prove change in affairs warranting conclusion that findings in prior case, conclusively assumed to be correct when made, are no longer true); *In re McKissie,* 103 B.R. 189, 192 (Bankr. N.D.Ill.1989) (to justify second chapter 13 petition, debtor must show *bona fide* objective change in circumstances since the filing and dismissal of the first chapter 13 case).

The evidence presented proves a bad faith filing.[16] Spectee filed its petition approximately five weeks after the Court dismissed the Realty case. Although technically an entity different from Realty, Gelbwaks conceded on December 12, 1994 that Spectee and Realty were the same corporation.[17] Consequently, the Spectee case represents a serial or successive filing, and the good faith of the petition must be judged accordingly.

Spectee never demonstrated any change in circumstances between the dismissal of the Realty case on October 14, 1994, and the filing of the Spectee case on November 23, 1994. Although Gelbwaks and Souto apparently "discovered" the existence of the $1.5 million Citibank claim, that claim existed at the time of the Realty petition.[18] Hence, it does not represent a change in circumstance since the filing or dismissal of the Realty

---

**16.** The Court's initial refusal to dismiss this case, and instead, to grant Fourth Federal's alternative request for relief from the stay, does not conflict with the conclusion that the case was filed in bad faith. *Cf. In re Cohoes Indus. Terminal, Inc.,* 931 F.2d at 229 (denial of United States Trustee's motion to dismiss, and reconversion of case from chapter 7 to chapter 11, preclude finding that petition was filed in bad faith); *In re French Bourekas, Inc.,* 175 B.R. at 523 (granting extension of time to assume or reject lease cuts against finding that petition was filed in bad faith). To the contrary, the Court granted relief from the stay precisely because it found, based upon the state of the record at the time, that Spectee had filed its petition in bad faith. In addition, a quick dismissal of a serial petition, filed on the eve of foreclosure, often plays into a debtor's strategy. By then the scheduled foreclosure date has passed, and if the Court dismisses the petition and the secured creditor reschedules the sale, the debtor may file again. *See In re Eat-*

*man,* 182 B.R. at 394. Consequently, in a single asset case primarily involving a two party dispute, it is often better to retain the case, lift the stay and allow the secured creditor the opportunity to foreclose.

**17.** Even if Gelbwaks had not conceded the obvious, the Court would have reached the same conclusion.

**18.** The Court doubts that Souto or Gelbwaks were even aware of the Citibank claim at the time of the Spectee filing. The Spectee petition does not refer to it despite the reference to the claim in the Assignment (RX 9) which is supposedly dated—but more likely backdated—one day earlier. It strains credulity to believe, as Gelbwaks testified, that the omission of Spectee's largest debt was an oversight. Sanctions Tr. at 306.

case. In addition, Spectee, like Realty, had no sublease, and despite the Respondents' contrary representations and sworn testimony, had no financing. The leasehold under Spectee was the same as the leasehold under Realty—vacant property that generated no income. Spectee and Realty had the same assets, the same liabilities, the same prospects and eventually suffered same fate.[19]

Instead, the Respondents filed the Spectee petition, like the Realty petition, to prevent Fourth Federal's foreclosure sale. Gelbwaks and Souto orchestrated the transfer of Realty's assets and liabilities—in violation of the requirements of New York law[20]—three days before Fourth Federal's foreclosure sale, signed the Spectee petition two days before the sale, and filed the Spectee case one day before the sale. They then manufactured a false paper trail, creating and then backdating documents of transfer after Gelbwaks had stated in open court that no such documents existed. As the Court found in connection with the relief from stay motion and reiterated when it denied Spectee's motion for a preliminary injunction, the Spectee Transfer served no legitimate business purpose. The Respondents filed the Spectee petition for the sole purpose of frustrating Fourth Federal's foreclosure efforts, and Spectee lacked any reasonable possibility of reorganization.

### 2. Bad Faith Continuation of the Case

 False representations during a bankruptcy proceeding regarding the existence of financing to fund a plan, made as part of a scheme to prevent a secured creditor from enforcing its rights, constitutes bad faith, and warrants sanctions. *See In re French Bourekas*, 175 B.R. at 524 (Bankr.

S.D.N.Y.1994). The Respondents filed this case one day before the scheduled foreclosure sale in order to stay it, and then repeatedly invoked the process of the bankruptcy court to delay the foreclosure sale. They lacked any realistic chance to reorganize, misrepresented the availability of financing necessary to the Spectee plan, and proposed a plan that Spectee could never confirm.

After the Court granted relief from the automatic stay on December 12, 1994, the Respondents continued to press Spectee's case. They presented emergency orders to show cause containing temporary restraining orders in late December 1994 and early January 1995. They commenced an adversary proceeding and conducted a day long preliminary injunction hearing on January 9, 1995, even after the Court warned Gelbwaks that he faced the possibility of sanctions. Every action they took after December 12, 1994, was aimed at stopping the rescheduled foreclosure sale slated for January 10, 1995.

The Respondents tried to justify their actions by contending that Spectee had a confirmable plan and the R.H.S. financing to make it work. Spectee never advised the Court that the funding depended upon something Spectee never had: an executed sublease. In addition, the Respondents proposed a plan that they knew they could never confirm because it assumed no sublease for one year but also assumed immediate funding from R.H.S. Had they represented the conditional nature of the financing, the Court would have determined as a matter of law that Spectee could not confirm a plan that assumed financing without any lease. The various proceedings that ensued in an at-

---

**19.** The Court ultimately dismissed the Spectee case on April 18, 1995, retaining jurisdiction to decide this sanctions motion.

**20.** Realty is a New York corporation, and cannot transfer all of its assets except pursuant to the procedures set forth in N.Y.Bus.Corp.Law § 909 (McKinney 1986). This requires adherence to certain corporate formalities, including a board of directors' resolution and a two-thirds vote of its shareholders. Spectee eventually produced transfer documentation which John Souto alone signed on behalf of Realty at a time when his father, Serge Souto, was a 50% shareholder.

The Court questioned whether the transfer was valid under New York law, and Souto testified that he could not remember whether any of the necessary meetings took place or resolutions passed. Tr. 1/9/95 at 61–62. At a subsequent hearing held one month later, he produced a corporate resolution (RX 11), dated February 9, 1995. The resolution, which only he signed, stated that Realty's directors and shareholders had met on November 21, 1994, and unanimously approved the Spectee Transfer. He never said what prompted his recall of this significant meeting.

tempt to enjoin the foreclosure sale were unnecessary, wasting the time of the Court and Fourth Federal.

The Court concludes that Fourth Federal is entitled to an award of sanctions pursuant to the Court's inherent power. The Respondents filed and continued to prosecute the Spectee case in bad faith. In addition, Fourth Federal moved to dismiss the petition within two weeks of the commencement of the case and only after first issuing a written warning (*see* MX T) to Gelbwaks to voluntarily dismiss the case or face sanctions. *Compare In re Cohoes Indus. Terminal, Inc.*, 931 F.2d at 229–30 (party that never moved to dismiss frivolous chapter 11 petition is estopped from seeking sanctions on account of a bad faith filing) *and In re French Bourekas, Inc.*, 175 B.R. at 523 (party who waited 15 months before moving to dismiss a bad faith filing waived sanctions under Bankruptcy Rule 9011) *and In re 72nd Street Realty Associates*, 185 B.R. 460, 475 (Bankr.S.D.N.Y.1995) (creditor who knew about a chapter 11 case but did nothing for nine months before taking any action is estopped from seeking Rule 11 sanctions) *with In re Eatman*, 182 B.R. at 390, 396 (sanctions awarded to party who moved in the alternative to dismiss the petition or for relief from the stay only one week after the filing).

## B. Sanctions under 28 U.S.C. § 1927

■ The Court will also award sanctions against Gelbwaks under 28 U.S.C. § 1927.[21] "A bankruptcy court may impose sanctions pursuant to 28 U.S.C. § 1927 if it finds that '[an] attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d at 230 (quoting *Oliveri v. Thompson*, 803 F.2d at 1273); *accord In re Eatman*, 182 B.R. at 396; *In re French Bourekas, Inc.*, 175 B.R.

at 523. This statute is concerned with limiting the abuse of court processes. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980). It "looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics." *United States v. International Bd. of Teamsters*, 948 F.2d at 1339; *accord In re 72nd Street Realty Associates*, 185 B.R. at 475.

There is little if any difference between the type of conduct sanctionable under the Court's inherent power and under 28 U.S.C. § 1927. Both require a similar finding of bad faith. *Oliveri v. Thompson*, 803 F.2d at 1273; *accord Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d at 37 n. 4; *In re Eatman*, 182 B.R. at 396. "Indeed, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is ... that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Oliveri v. Thompson*, 803 F.2d at 1273: *accord Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 878 F.Supp. 626, 628 (S.D.N.Y.1995); *accord Dreiling v. Peugeot Motors of America, Inc.*, 768 F.2d 1159, 1164 (10th Cir.1985) ("Section 1927 is a natural outgrowth of the inherent authority of a court to assess costs and attorney's fees.").

Gelbwaks should be sanctioned under 28 U.S.C. § 1927. This follows from the Court's findings relating to the award of sanctions against Gelbwaks pursuant to its inherent power.

## C. Sanctions Under Fed.R.Bankr.P. 9011

■ Fed.R.Bankr.P. 9011[22] authorizes and directs a court to sanction an attorney or

---

21. Section 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and at-

torneys' fees reasonably incurred because of such conduct.

22. Fed.R.Bankr.P. 9011 provides, in pertinent part, as follows:

Every petition, pleading, motion and other paper served or filed in a case under the Code

party who signs a pleading or other submission that he knows, or should know after reasonable inquiry, contains misstatements. It is similar to the pre–1993 version of Fed. R.Civ.P. 11, and the Court may look to the developed case law under the former Rule 11 in interpreting Bankruptcy Rule 9011. *See In re Coones Ranch, Inc.,* 7 F.3d 740, 743 n. 4 (8th Cir.1993); *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d at 227; *In re 72nd Street Realty Associates,* 185 B.R. at 470–71. In *Cohoes,* the Second Circuit Court of Appeals established the criteria for applying Bankruptcy Rule 9011:

> A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings. [Citations omitted]. Generally, courts should conclude that a debtor has no demonstrable intent to reorganize only if, upon considering the totality of the circumstances, there is substantial evidence to indicate that the debtor made a bad faith filing. [Citations omitted].

*Id.* at 227.

■ The test for bad faith under Rule 11—and hence, Bankruptcy Rule 9011—is an objective one. *Sussman v. Bank of Israel,* 56 F.3d 450, 456–57 (2d Cir.1995). *Oliveri v. Thompson,* 803 F.2d at 1275; *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985). An attorney cannot escape sanctions by demonstrating his subjective good faith. *Sussman v. Bank of Israel,* 56 F.3d at 456; *Oliveri v. Thompson,* 803 F.2d at 1275; *Eastway Construction Corp. v. City of New York,* 762 F.2d at 253. To support sanctions under Rule 11, it must be

"patently clear that a claim has absolutely no chance of success." *Id.* at 254.

■ Both Gelbwaks and Souto signed the Spectee petition, and in doing so, violated Bankruptcy Rule 9011. The Respondents had to blind themselves to reality to seriously think that the Spectee case had any chance to succeed. The Court had dismissed the Realty case five weeks earlier, and Realty never appealed. Gelbwaks and Souto, through the machinations described above, simply changed Realty's name to Spectee, and filed the same case. They never demonstrated any change in circumstances that might permit a successive filing so soon after the dismissal of the previous case, and the Spectee case was inevitably headed for the same fate from the moment it was filed.

In addition, the Spectee petition contains misstatements for which both Respondents, or at least Souto, are responsible. In the Realty case, Souto and Gelbwaks contended as late as October 14, 1994, that the leasehold was worth $300,000.00. Yet the Spectee petition that they both signed only five weeks later states that the estimated value of the leasehold ranges between $500,000.00 and $999,000.00. Further, the accompanying Rule 52 affidavit, signed by Souto and notarized by Gelbwaks, states that the value of the leasehold is $800,000.00. Six weeks later, both had again grown conservative, valuing the property at $215,000.00.

Gelbwaks alone, or together with Souto, signed and submitted other documents that perpetuated the myth that Spectee could confirm a plan based on financing it did not have. For instance, Gelbwaks signed the January 4, 1995 complaint (MX V) stating

on behalf of a party represented by an attorney, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated.... The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and

that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.... If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

that Spectee had submitted a confirmable plan. That plan required Spectee to pay $250,000.00 on the effective date, $215,000.00 to Fourth Federal and $35,000.00 to the unsecured creditors. Spectee (or Souto) intended to borrow the funds from R.H.S., but without an executed sublease, R.H.S. would not even consider much less fund the loan. Spectee had no sublessee, no loan and no confirmable plan when Gelbwaks signed the complaint.[23]

Both Souto and Gelbwaks also signed the disclosure statement (MX X) that formed the basis of the January 9 hearing in which Spectee sought a preliminary injunction. In this document, the Respondents proposed a plan which *expressly* provided for R.H.S. financing without a sublease. There is no circumstance under which they could objectively justify the presentation of this plan; Sedrish of R.H.S. required an executed sublease before he would even consider funding.

Consequently, the Court concludes that Gelbwaks and Souto signed the Spectee petition and the January 9 disclosure statement, and Gelbwaks signed the complaint and preliminary injunction application in bad faith. They needed no inquiry to know that their petition was hopeless and their plan unconfirmable.

### D. The Nature and Amount of the Award

#### 1. Introduction

The same standards of compensation and reimbursement apply whether sanctions are awarded under Fed.R.Civ.P. 11 (and hence under Fed.R.Bankr.P. 9011), 28 U.S.C. § 1927 or the Court's the inherent power. *See PaineWebber, Inc. v. Can Am Financial Group, Ltd.,* 121 F.R.D. 324, 334 (N.D.Ill.1988), *aff'd without op.,* 885 F.2d 873 (7th Cir.1989). The injured party can recover those "attorney's fees incurred attributable to investigating, researching and fighting" the debtor's meritless petition as well as the fees incurred "to research, prepare and prosecute" its sanctions motion. *See id.* at 334–35. The party seeking the sanction

must provide the Court with contemporaneous time and expense records that specify, for each attorney, the date, amount of time, and nature of the work performed, and must also show that the fees and expenses were reasonable and necessary. *Wood v. Brosse, U.S.A., Inc.,* 149 F.R.D. 44, 52 (S.D.N.Y. 1993); *see Caisse Nationale de Credit Agricole–CNCA, New York Branch v. Valcorp, Inc.,* 28 F.3d 259, 266 (2d Cir.1994).

The amount to be awarded is committed to the Court's discretion. *See id.; Ordower v. Feldman,* 826 F.2d 1569, 1575–76 (7th Cir.1987); *Eastway Construction Corp. v. City of New York,* 821 F.2d 121, 122 (2d Cir.), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *In re French Bourekas, Inc.,* 183 B.R. 695, 697 (Bankr. S.D.N.Y.1995). The Court normally begins with the lodestar amount, and may then adjust it upwards or downwards. *Harb v. Gallagher,* 131 F.R.D. 381, 384–85, 389 (S.D.N.Y.1990) (adopting magistrate's report and recommendation). The Court need not routinely award the lodestar amount, *Eastway Construction Corp.,* 821 F.2d at 122, but only the portion of the attorney's fee "thought reasonable to serve the sanctioning purpose of the Rule [11]." *Id.* at 123; *accord In re French Bourekas, Inc.,* 183 B.R. at 697 (under 28 U.S.C. § 1927, the court can "assess what is necessary to deter, rather than compensate"). This does not mean that the Court should not award the lodestar amount; to the contrary, this sanction is typical. *Wood v. Brosse,* 149 F.R.D. at 52; *see Caisse Nationale de Credit,* 28 F.3d at 266–67.

#### 2. Legal Fees

During the three day sanctions hearing, the Court heard testimony and received documentary evidence regarding Fourth Federal's attorney's fees and expenses. According to the documentary evidence, Zeichner, Ellman & Krause (the "Firm"), Fourth Federal's bankruptcy counsel, expended 138.80 hours of time rendering legal and paralegal

---

23. Gelbwaks also signed the application (*see* MX W), dated January, 1995, in support of Spectee's motion for a temporary restraining order and a preliminary injunction preventing Fourth Federal's foreclosure sale. The motion was based on the same false premise as the complaint—a confirmable plan.

services on its behalf in this bankruptcy case between November 23, 1994 and February 28, 1995. The bills (MXX N–1 [November 1994], N–2 [December 1994], N–3 [January 1995] and O [February 1995] )[24] that reflect these services were prepared from contemporaneous or substantially contemporaneous time records that each attorney or paralegal maintains. Sanctions Tr. at 188.

The time charges reflected by these exhibits total $26,388.50, and the blended hourly rate equals $190.12. In addition, on April 6, 1995—the final hearing day—Mr. Janovsky, the attorney at the Firm primarily responsible for the matter—testified that he had billed eighth-tenths of an hour in March, and estimated that he would bill approximately seven hours in April through the date of the hearing. Sanctions Tr. 268–69. The value of these services is $1,560.00, and the addition of Janovsky's post-February 1995 services raises the overall hours to 146.60, the lodestar amount to $27,948.50, and the blended hourly rate to $190.64.

While the Respondents have challenged the necessity and appropriateness of certain of the services (*e.g.,* the contempt motion), they have never argued that the Firm's billing rates are unreasonable,[25] that the Firm staffed the matter inappropriately, or that the time records do not provide sufficient detail. The Court has reviewed both the redacted and unredacted bills, and is satisfied that with the exception of certain time entries described below, they provide sufficient detail to meet the substantiation requirements pertaining to sanctions motions, and reflect reasonable and necessary services required by Fourth Federal to address the filing of the petition, the subsequent proceedings designed to prevent the foreclosure and the prosecution of the sanctions motion.

As noted, some of the time entries do not pass muster. Many of the time entries describe an activity characterized as "attention to," followed by a specific description of the subject matter. The use of the phrase "attention to" may represent the Firm's shorthand method of describing an activity; it does not, however, enlighten the Court. During the four months at issue, Mr. Schwed billed $3,107.50 to "attention" matters. Certain other attorneys or paralegals used similar descriptions, and the value of these services totals $393.00. In addition, the time records reflect $292.50 in paralegal time described simply as "appearance at court." These services were billed on days when no hearings were being conducted, and the description is not sufficiently detailed.

Certain services described in the time records proved unnecessary. These include the work done on the contempt motion which the Court denied without prejudice and Fourth Federal never renewed. Aside from Schwed, whose time has already been discounted, only Janovsky worked on the contempt motion, rendering $798.00 worth of services. Sanctions Tr. at 209–10.

The time records also included work done on other matters not directly related to the Spectee bankruptcy. For example, Janovsky billed $120.00 in January 1995, preparing a foreclosure report for Fourth Federal. *See id.* at 205. He also testified that a December 15, 1994 time entry (*see* MX N–2) attributable to "MA" (*i.e.,* Michael Antonovich), and representing $110.00 in billable time, pertained to another case. Sanctions Tr. at 204. The aggregate of the improperly documented, unnecessary and unrelated work equals $4,130.87, reducing the lodestar by that amount, and leaving a balance of $23,127.50.

The Court sees no reason to increase any fee award to reflect the services rendered by

---

**24.** Fourth Federal offered redacted time records to avoid the argument that it had waived the attorney-client or work product privileges. Sanctions Tr. at 194. Fourth Federal also provided the Court with unredacted copies of these exhibits, without objection or request from the Respondents that the Court rule on any privilege question. The Court has compared the redacted and unredacted versions solely to ensure that the records satisfy the documentation requirements and describe actual and necessary services.

**25.** The exhibits do not state each attorney's billing rate, but this information was provided through trial testimony. Sanctions Tr. 202–05. The Court is satisfied, both from the absence of any objection and its own extensive experience with fee applications in this district, that the Firm's rates are reasonable.

Isaac Anolic, Fourth Federal's foreclosure counsel. First, these fees arguably represent consequential damages, and for the reasons discussed below, cannot be recovered. Second, Fourth Federal failed to demonstrate the necessity, reasonableness or extent of Mr. Anolic's services.

 Anolic testified that as a result of the Spectee filing, he spent some minimal time readvertising the sale, *id.* at 98, attempted unsuccessfully to speak to the referee four to five times, *id.* and spoke to between eight and ten unidentified prospective purchasers. *Id.* at 98–99. Anolic estimated that each call lasted ten to fifteen minutes. *Id.*

This evidence does not warrant an award. Attempted phone contact with the referee, most of which was spent holding the phone until his secretary came back on the line, *id.* at 98, is neither reasonable nor necessary. In addition, it is not clear that the calls from prospective purchasers represent additional expenses caused by the Spectee filing or new opportunities and buyer interest cultivated during the delay. Finally, the Court cannot accept that every call lasted ten to fifteen minutes. The Court recognizes that Anolic testified to an estimated range, but the estimate is questionable and cannot support an award of attorney's fees.

### 3. Costs and Expenses

According to Mr. Janovsky, the Firm pays outside vendors in the ordinary course, and then bills the client. Sanctions Tr. at 191. It also bills its client for internal disbursements, including photocopying at $.20 per page, the same amount charged to Fourth Federal in this case. *Id.* at 191–92. Janovsky did not believe that the Firm "marked up" its expenses incurred to outside vendors,

*id.* at 192–93, and no evidence was offered suggesting that it did.

Fourth Federal presented evidence indicating that it incurred costs and expenses in the sum of $5,099.87 during December 1994, and January and February 1995. (*See* MXX N–1, N–2, N–3, O).[26] In its post-trial memorandum, at page 23, it states that it is only seeking $4,130.87[27] on account of expenses incurred by the Firm. Fourth Federal does not explain the reason for the reduction, although it may be that some of the costs reflected in the bills actually relate to the Realty case or some other matter.[28] In light of its reduced request, the Court finds that Fourth Federal incurred costs and expenses in the sum of $4,130.87 as a result of the Firm's efforts in this case.

### 4. Other Fees and Expenses

 The Court has little trouble concluding that the type of sanctions that Fourth Federal can recover includes the excess attorneys fees, costs and expenses incurred *in this proceeding* and directly related to the Respondents' sanctionable conduct. *See PaineWebber, Inc. v. Can Am Financial Group, Ltd.,* 121 F.R.D. at 334–335. A litigant cannot, on the other hand, rely on a sanction motion to seek compensation for every injury that sanctionable conduct produces. For example, a litigant cannot, in the guise of a Rule 11 motion, recover consequential damages. *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 553–54, 111 S.Ct. 922, 934, 112 L.Ed.2d 1140 (1991); *Elliott v. The M/V Lois B,* 980 F.2d 1001, 1007 (5th Cir.1993) ("Rule 11 sanctions should not be assessed as a substitute for tort damages."); *West v. West,* 126 F.R.D. 82, 84 (N.D.Ga.

**26.** Fourth Federal's post-trial memorandum of law states that it paid $1,880.00 for the sanctions hearing transcript. Fourth Federal, however, never offered any evidence of its actual or estimated costs for the transcripts, and never sought to reopen the proof to permit it to do so. The Court will not, therefore, consider this cost in arriving at its award.

**27.** Coincidentally, this represents the exact sum that the Court has deducted from the original lodestar amount.

**28.** For instance, the February bill (MX 0) includes a $75.00 charge concerning an "RJI Fee." This apparently pertains to a Request for Judicial Intervention, a creature of New York state court practice. *See* Uniform Rules for the New York State Trial Courts, 22 N.Y.C.R.R. § 202.6 (1994). Fourth Federal has failed to explain why this represents a cost that it can recover in connection with its motion for sanctions.

1989) ("Consequential damages are not authorized for a Rule 11 violation."). Although the Court's research does not reveal such a clear, bright line test regarding sanctions under 28 U.S.C. § 1927 or the Court's inherent power, the same limitation should apply. Sanctions do not substitute for tort claims, and this should be true, regardless of the basis of the sanction, in the absence of a clear and contrary indication.

 Certain expenses which Fourth Federal now seeks do not relate to its efforts in this Court to obtain stay relief, oppose the injunction or seek sanctions. For example, Fourth Federal seeks to recover the additional monthly maintenance and insurance it had to pay as a result of the delay in the foreclosure following the filing of the case. It also seeks an award for its additional costs pertaining to the need to re-notice the foreclosure sale.[29] These latter claims step over the permissible boundary of sanctions and into the province of consequential damages arising in connection with the parties' underlying business transaction.

Fourth Federal's additional maintenance and insurance expenses are a form of delay damages. It argues, in substance, that had it been able to conduct its foreclosure sale on November 24, 1994, a buyer (other than Fourth Federal) would have purchased the leasehold and made these payments. Thus, the filing interfered with its contractual right to foreclose and receive payment on its claim, and compelled it to incur additional costs in connection with the underlying loan. This also applies to the cost of renoticing the foreclosure sale.

 Business injuries—as opposed to increased litigation costs—represent consequential damages that must be pursued in a plenary action. *See, e.g., West v. West,* 126 F.R.D. at 84 (Rule 11 does compensate party where the improper filing chilled the proposed sale of its business); *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 121 F.R.D. 402, 406 (N.D.Cal. 1988) (Rule 11 does not permit a party to recover excess business-related costs and lost profits as a result of commencement of case),

*rev'd in part on other grounds,* 892 F.2d 802 (9th Cir.1989), *aff'd,* 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). If Fourth Federal intends to recover for these injuries, it must commence an independent action sounding in tort.

### E. The Final Award

Having computed the lodestar amount of Fourth Federal's fees and costs and expenses directly attributable to the improper filing and continuation of this case, the Court must determine whether any factors warrant a reduction. The aggregate fees, costs and expenses total $27,258.37, and there are good reasons not to reduce the award. First, the Respondents were warned twice about the possibility of sanctions early in the case. Janovsky issued a written warning on November 28, 1994, and the Court issued an oral warning to Gelbwaks on January 6, 1995. Both proved futile. Second, the Respondents lied about the financing commitment, and lying must be deterred. Third, Fourth Federal and its counsel conducted themselves appropriately, and did not increase the legal fee through their own improper litigation tactics.

 The Court will, therefore, award sanctions against Gelbwaks, Souto and Spectee in the sum of $27,258.37. The award will be joint and several because Gelbwaks and Souto colluded, *see Kenna v. United States Dep't of Justice,* 128 F.R.D. 172, 177 (D.N.H. 1989), and are equally culpable. *See Wood v. Brosse,* 149 F.R.D. at 53. In this regard, they worked in concert transferring Realty's assets to Spectee (and creating backdated transfer documentation), filing the Spectee petition and urging its unconfirmable plan.

The foregoing shall constitute the Court's findings of facts and conclusions of law pursuant to Fed.R.Bankr.P. 7052 and Fed. R.Civ.P. 52.

SETTLE ORDER ON NOTICE.

---

**29.** Anolic's attorney's fees arguably fall into this same category.